GENERAL ELECTRIC COMPANY,
Plaintiff,

v.

COMPAGNIE EURALAIR,
S.A., Defendant.

No. 96 Civ. 884 (SAS).

United States District Court,
S.D. New York.

July 26, 1996.

Aaron R. Marcu, Howard, Darby & Levin, New York City, for Plaintiff.

Rolande Cutner, France, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

### I.  Introduction

This is a contract dispute arising out of agreements between Plaintiff General Electric Company ("GE") and Defendant Compagnie Euralair, S.A. ("Euralair"). GE is a New York corporation whose business includes the manufacture of aircraft engines. Affidavit of Aaron Marcu, Attorney for Plaintiff ("Marcu Aff."), Ex. 2 (Complaint) ¶ 6. Euralair, a French corporation, is engaged in the commercial airline business. Marcu Aff., Ex. 4 (Answer) ¶ 1. GE's complaint states two causes of action, each alleging a breach by Euralair of one of the agreements structuring the sale to Euralair of GE jet engines. Euralair answered the complaint, asserted an affirmative defense of promissory estoppel, and counterclaimed for breach of the covenant of good faith and fair dealing. GE has moved for summary judgment and for dismissal of the counterclaim.

### II.  Standard for Summary Judgment

A party is entitled to summary judgment when there is "no genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. See Fed.R.Civ.P. 56(c); Celotex v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden of demonstrating the absence of a material factual dispute rests on the moving party. See Gallo v. Prudential Residential Services, Ltd., 22 F.3d 1219, 1223 (2d Cir.1994). However, the non-moving party must present "significant probative supporting evidence" that a factual dispute exists. Fed.R.Civ.P. 56(e); Anderson, 477 U.S. at 249, 106 S.Ct. at 2510. The opposing party may not rely on unsupported denials or allegations. Anderson, 477 U.S. at 256, 106 S.Ct. at 2514.

For purposes of summary judgment, the court's role is to determine whether issues exist to be tried, not to try issues of fact. See Balderman v. United States Veterans Admin., 870 F.2d 57, 60 (2d Cir.1989); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir.1987). All ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. See Anderson, 477 U.S. at 255, 106 S.Ct. at 2513; Donahue, 834 F.2d at 57, 60. If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir.1994).

Furthermore, in contract actions, "summary judgment is appropriate where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning." United States v. 0.35 of an Acre of Land, 706 F.Supp. 1064, 1070 (S.D.N.Y.1988). A court may not draw any inference or give any construction to the terms of a written contract that "may be in conflict with the clearly expressed language of the written agreement." Id.

### III.  Facts

In December 1990, Euralair agreed to buy from Boeing two Boeing 777 airplanes, each equipped with two jet engines. Defendant's Statement Pursuant to Local Civil Rule 3(g) ("Def. 3(g)") ¶ 1.[1] After a competition among three manufacturers, Euralair selected GE to manufacture the engines that would be placed in the two Boeing planes. Defendant's Memorandum in Opposition to Summary Judgment and Dismissal of Defendant's Counterclaim ("Def.Mem.") at 4; Def. 3(g) ¶ 1(a). Further, Euralair agreed to place an order with GE for a spare engine by a certain date. Pl. 3(g) ¶ 1; Def. 3(g) ¶ 1(a).

#### A.  Structure of Purchase/Advance

Euralair's purchase of the engines was effected through a series of financing agree-

---

1. In its 3(g) Statement, GE states that December 1992 was the date of both the agreement between Euralair and Boeing and the agreements between Euralair and GE. See Plaintiff's Statement Pursuant to Local Civil Rule 3(g) ("Pl. 3(g)") ¶ 1. The Court assumes that GE meant to say that while the Euralair/Boeing agreement was made in 1990, the Euralair/GE agreements date from 1992. See Affidavit of Rolande Cutner, Attorney for Euralair ("Cutner Aff."), Ex. 1.

ments. GE agreed to give Euralair a $20 million rebate on the price of the engines and to arrange for Euralair to receive a payment of $10 million of the rebate (also called an Introductory Allowance).[2] Pl. 3(g) ¶ 2; Def. 3(g) ¶ 2. According to GE, the $10 million Introductory Allowance was structured in the following manner: (1) Euralair issued notes in the amount of $10 million (the "Notes") and sold the Notes to Automated Cash Management Trust (ACMT), an institutional investor; (2) GE guaranteed Euralair's repayment of the Notes; and (3) Euralair indemnified GE's guarantee obligations. Pl. 3(g) ¶ 4. On December 22, 1992, GE, Euralair and ACMT executed the financing agreements, which GE attached as exhibits to the complaint. Pl. 3(g) ¶ 5.[3] Euralair does not directly dispute this characterization of the transaction, but states that the financing agreements attached to the complaint "do not reflect the actual nature of the discussion entertained between GE and Euralair during the year 1992." Def. 3(g) ¶ 4.

### B. Relevant Financing Agreements

The financing agreements attached to the complaint consist of the following: *Note Purchase Agreement* (Cplt.Ex. A), made between Euralair and ACMT; *Notes* (Cplt.Ex. B), made between Euralair and the Noteholder (ACMT at time of making); *Guaranty Agreement* (Cplt.Ex. C), made between GE and ACMT; *Reimbursement Agreement* (Cplt.Ex. D), made between GE and Euralair; and the *Administrative Agreement* (Cplt.Ex. E), made among GE, ACMT, and

Pittsburgh National Bank. All of the agreements are dated December 22, 1992.[4]

Several other agreements are relevant to the dispute between GE and Euralair. First, a *Security Agreement* was also executed by GE and Euralair on December 22, 1992 (*see* Second Marcu Aff., dated May 8, 1996, Ex. 1). According to GE, this agreement represents GE's acceptance, as collateral and in "connection with guaranteeing the $10 million loan to Euralair," of a security interest in Euralair's contract with Boeing for the two 777 jet airplanes. Pl.Reply Mem. at 4. Second, GE and Euralair entered into *Letter Agreement No. 2*, dated December 16, 1992 (*see* Second Marcu Aff., Ex. 2; Cutner Aff., Ex. 3). This letter agreement consists of a three-page commitment letter and two attachments. GE contends that this letter agreement was entered into in anticipation of the detailed financing agreements that followed six days later. Pl.Reply Mem. at 5.

### C. Key Provisions of the Agreements

Under the Reimbursement Agreement, "[e]ach of the following acts, occurrences or conditions before the Final Maturity Date shall constitute an 'Event of Prepayment': (b) The failure by [Euralair] to place a firm and unconditional order with [GE] not later than April 30, 1995 for one new GE90–B4 spare aircraft engine ..."[5] Cplt.Ex. D, § 6.1(b). Further, "[i]f an Event of Prepayment has occurred, [GE] may, in its sole discretion, instruct [Euralair] to exercise its right to prepay all or any portion of the outstanding principal of the Notes...." *Id.* § 6.2. If Euralair "shall fail to perform or

---

**2.** The parties disagree over whether GE agreed to give Euralair the rebate "in connection with" the agreements for Euralair to buy planes from Boeing and for Euralair to order a spare engine from GE. *See* Pl. 3(g) ¶ 2; Def. 3(g) ¶ 2. Euralair contends that GE agreed to provide a rebate because GE was determined to have Euralair select GE's engine over that of its competitors. Def. 3(g) ¶ 2.

**3.** Euralair purports to dispute this allegation (*see* Def. 3(g) ¶ 5). However, Euralair does not deny that the agreements exist. Euralair simply disputes the relevance of the agreements. Because the agreements are attached to the complaint, the Court can see for itself that the agreements exist, and that they were signed by certain parties (including Euralair, which signed the Note Purchase Agreement (Ex. A), the Notes (Ex. B),

and the Reimbursement Agreement (Ex. D)). The relevance of a document is not a fact which can be disputed.

**4.** Each of these agreements contains a "governing law" provision designating New York law as controlling.

**5.** Despite Euralair's signature (through Alex Couvelaire, its President) on the Reimbursement Agreement, Euralair now disputes that it was required to order a spare GE engine by April 30, 1995. Rather, because the date of delivery of the two Boeing 777 planes was changed from April and May 1997 to October and November 1998, Euralair contends that the deadline for ordering a spare engine changed accordingly. This contention is addressed in Part IV.A., *infra.*

observe any of its agreements, covenants or obligations arising under this" agreement, such failure shall "constitute an 'Event of Default'" under the Reimbursement Agreement. *Id.* § 7.1(b)(i).

Pursuant to the Note Purchase Agreement, "ACMT agreed to pay Euralair $10 million for the Notes, and Euralair agreed to repay that amount by May 31, 1997." Def. Mem. at 13 (citing Cplt.Ex. A, ¶ 1.1; Cplt.Ex. B, ¶ 1); Pl.Reply Mem. at 2. One of the events constituting an "Event of Default" under the Note Purchase Agreement is that the "Noteholder shall have received written notice from [GE] that an Event of Default has occurred and is continuing under the Reimbursement Agreement." Cplt.Ex. A, § 9.1(f).

Under the Guaranty Agreement, GE guaranteed Euralair's obligation to pay the principal and post-maturity interest on the Notes, plus certain taxes. Cplt.Ex. C, §§ 1, 2(a); Pl.Mem. at 4. The Guaranty Agreement also provides that GE may fulfill its obligations as guarantor by purchasing the Notes from ACMT upon an Event of Default under the Note Purchase Agreement: "[u]pon the occurrence and during the continuance of any Event of Default [under the Note Purchase Agreement], [GE] shall have the right, but shall not be obligated to: (ii) purchase the then outstanding principal amount of the Guaranteed Notes from the Noteholder...." Cplt.Ex. C, § 3(b)(ii).

Finally, the Reimbursement Agreement provides that "[i]n the event that [GE] makes any payment under the Guaranty Agreement in respect of principal of the notes, [Euralair] shall, immediately upon demand by [GE], reimburse [GE] for such payment, together with interest thereon...." Cplt.Ex. D, § 2.1.

### D. *Events after 1992*

According to GE, the following events occurred after GE and Euralair entered into the above-described financing agreements. In its 3(g) Statement, Euralair purports to deny these allegations by GE. However, Euralair does not really dispute that the events occurred. Rather, Euralair either disagrees with the relevance of the events or seeks to explain why the events were justi-

fied or do not constitute an act of default. Accordingly, I will first describe the events as related (and evidenced) by GE, and will then address whether the actions constitute an act of default.

Euralair did not order a spare GE engine, either before or since April 30, 1995. Pl. 3(g) ¶ 15. By letter dated August 21, 1995, GE issued a Prepayment Instruction to Euralair, pursuant to § 6.2 of the Reimbursement Agreement. *Id.* ¶ 16. This letter informed Euralair that "unless Euralair agreed to a restructuring of the financing arrangement, Euralair was required to prepay the entire outstanding principal of the Notes by" September 8, 1995. *Id.; see also* Cplt.Ex. F. Euralair did not follow the Prepayment Instruction or otherwise agree to a restructuring. Pl. 3(g) ¶ 17. Believing that Events of Default had occurred under both the Reimbursement Agreement and the Note Purchase Agreement, GE provided written notice to this effect to ACMT on January 29, 1996. GE sent a copy of this notice to Euralair. Pl. 3(g) ¶ 21; Cplt.Ex. G.

According to GE, this written notice to ACMT triggered "both automatic acceleration of the Notes under the Note Purchase Agreement and GE's obligations under the Guaranty Agreement to pay the outstanding principal of the Notes or to purchase the Notes from ACMT." Pl. 3(g) ¶ 22 (citing Cplt.Ex. A §§ 9.1(f), 9.2(a); Cplt.Ex. B at 2; Cplt.Ex. C §§ 2(a), 3(b)). GE purchased the Notes from ACMT on January 29, 1996. Pl. 3(g) ¶ 23; Cplt.Ex. H. GE then demanded, by letter dated January 30, 1996, that Euralair "immediately reimburse GE for the principal amount of the Notes and interest accrued thereon as well as for all costs, fees, liabilities, losses and expenses incurred by GE in connection with Euralair's defaults." Pl. 3(g) ¶ 25; Cplt.Ex. I. Euralair admits that it did not comply with GE's payment demands. Def. 3(g) ¶ 26; Pl. 3(g) ¶ 26.

GE now seeks repayment of the $10 million advance, plus interest (at the rates specified in the financing agreements), expenses and attorneys' fees. In its counterclaim, Euralair seeks dismissal of the complaint and

judgment in the amount of $20 million plus interest, costs and disbursements.

### IV. *Discussion*

Euralair presents three arguments against granting summary judgment in favor of GE.

#### A. *Euralair is Not in Default*

##### 1. *Arguments*

First, Euralair argues that it is not in default of the Note Purchase Agreement or the Reimbursement Agreement. Euralair admits that it did not order a spare GE engine by April 30, 1995. Answer ¶¶ 17–18. GE alleges that this failure to order is an Event of Prepayment under the Reimbursement Agreement, and Euralair acknowledges that the Reimbursement Agreement "specifies certain circumstances under which GE may instruct Euralair to prepay the Notes." Def.Mem. at 14 (citing Cplt.Ex. D, ¶ 6). However, Euralair contends that the failure to order a spare engine by that date is not an Event of Prepayment.

Euralair points to the purchase agreement between Boeing and Euralair, which provided that the two Boeing 777 airplanes would be delivered to Euralair in April and May, 1997. *See* Cutner Aff., Ex. 1 § 2.1. Next, Euralair points to Letter Agreement No. 2 between GE and Euralair, which states that "Euralair agrees to place a firm and unconditional purchase order with GE, at least *twenty-four (24) months prior to delivery of the first of the above two (2) 777–B aircraft*, for a minimum quantity of one (1) spare new GE90–B4 Engine in support of such two aircraft. . . ." Cutner Aff., Ex. 3; Second Marcu Aff., Ex. 2 (emphasis added). Finally, Euralair states that it could not proceed with the spare engine order because its contract with the "large French government-owned commercial airline" was not renewed in April 1995. Def.Mem. at 14. Consequently, Boeing agreed to delay until October and November 1998 the delivery of the two airplanes Euralair had agreed to buy. Cutner Aff., Exs. 11, 21.

Euralair argues that the provision of Letter Agreement No. 2 requiring it to order a spare engine at least 24 months before delivery of the first Boeing airplane signifies that the order deadline was floating. Under this theory, when the expected delivery date of the airplanes was moved back, Euralair's deadline for ordering a spare GE engine moved back as well. *See* Def. 3(g) ¶ 15; Def.Mem. at 14–15. GE replies that Euralair's theory overlooks certain portions of Letter Agreement No. 2. The letter agreement states that the "terms of advancement of the US $10,000,000" introductory allowance "are outlined in Attachment A to this Letter Agreement No. 2." Second Marcu Aff., Ex. 2 at 2. Attachment A states, in part, that:

> GE intends to provide the funds for any advance of the Introductory Allowance by unconditionally guaranteeing, to financial institutions selected by GE, the principal and accrued interest of notes issued by Euralair in accordance with the terms of this agreement. GE's obligation to furnish its guarantee is conditioned upon the preparation, negotiation, execution and delivery of definitive documentation pertaining thereto containing such provisions as GE and its legal counsel deem appropriate in their sole discretion.

Second Marcu Aff., Ex. 2, Attachment A at 1. According to GE, this reference to "definitive documentation" contemplates the financing agreements entered into six days later, including the Reimbursement Agreement, under which Euralair was required "to place a firm and unconditional order with [GE] not later than April 30, 1995 for one new GE90–B4 spare aircraft engine . . ." Pl.Reply Mem. at 7; Cplt.Ex. D, § 6.1(b).

##### 2. *Analysis*

Euralair's argument suggests that the Court must determine whether the two agreements are in conflict. "Generally, the rule is that separate contracts relating to the same subject matter and executed simultaneously by the same parties may be construed as one agreement." *Williams v. Mobil Oil Corp.*, 83 A.D.2d 434, 439, 445 N.Y.S.2d 172 (2d Dep't 1981) (citing *Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972)). Therefore, I shall construe Letter Agreement No. 2 and the Reimbursement Agreement as one agreement. According to

other general rules of contract construction, the preferred "interpretation of an instrument ... avoids inconsistencies and gives meaning to all of its terms." *Bed 'N' Bath of Spring Valley, Inc. v. Spring Valley Partnership*, 185 A.D.2d 584, 587, 586 N.Y.S.2d 416 (3d Dep't 1992); *see also Rentways, Inc. v. O'Neill Milk & Cream Co.*, 308 N.Y. 342, 347, 126 N.E.2d 271 (1955) (" '[t]hat interpretation is favored which will make every part of a contract effective' ") (citing *Fleischman v. Furgueson*, 223 N.Y. 235, 239, 119 N.E. 400 (1918)). "[W]here there is an apparent repugnancy between two clauses of a contract, the court has the duty to reconcile them, if possible." *People v. Stokes*, 165 Misc.2d 934, 937, 630 N.Y.S.2d 634 (Sup.Ct.Monroe Co.1995) (citing *Hudson–Port Ewen Assoc., L.P. v. Chien Kuo*, 165 A.D.2d 301, 303–304, 566 N.Y.S.2d 774 (3d Dep't), *aff'd*, 78 N.Y.2d 944, 573 N.Y.S.2d 637, 578 N.E.2d 435 (1991)). Further, "where there are general and specific provision relating to the same matter, the special provisions control, even if there is an inconsistency." *Id.* at 938, 630 N.Y.S.2d 634 (citing *Lewiston–Porter Central School District v. Sobol*, 154 A.D.2d 777, 779, 546 N.Y.S.2d 227 (3d Dep't 1989), *appeal dismissed*, 75 N.Y.2d 978, 556 N.Y.S.2d 530, 555 N.E.2d 927 (1990)). According to these principles, the contract in the instant case must be interpreted in favor of the specific provision (that the order deadline was April 30, 1995) rather than the more general provision (that the order deadline was 24 months before delivery of the first Boeing plane).[6]

In sum, the financing agreements provide that, unless Euralair placed a firm order for a spare GE engine by April 30, 1995, GE could issue a Prepayment Instruction to Euralair, instructing Euralair to repay the $10 million advance from GE. The term in Letter Agreement No. 2 requiring an order 24 months prior to delivery does not negate the more specific term in the Reimbursement Agreement. Euralair admittedly failed to order the spare engine by the April 30, 1995 deadline. Euralair does not contend that any modification was made to the Reimbursement Agreement, which was executed six days after Letter Agreement No. 2. Therefore, as alleged by GE, Euralair was in default of the Reimbursement Agreement as of September 8, 1995, when the deadline for complying with GE's August 21, 1995 Prepayment Instruction passed. *See* Pl. 3(g) ¶¶ 17–20; Cplt.Ex. D, § 7.1(b)(i). Further, Euralair was in default of the Note Purchase Agreement as of January 29, 1996, when GE provided written notice to ACMT that an Event of Default had occurred and was continuing under the Reimbursement Agreement. *See* Pl. 3(g) ¶¶ 21–22; Cplt.Ex. A, § 9.1(f). Euralair has failed to raise a genuine issue of material fact as to whether it defaulted on these Agreements.[7]

### B. *Euralair's Assignment of Boeing Contract to GE Replaced Euralair's Obligation to Repay the Advance*

Euralair's next argument focuses on GE's acquisition of a security interest in Euralair's contract with Boeing for the two 777 jet airplanes. Euralair suggests that this assignment took the place of any obligation by Euralair to reimburse GE for the Introductory Allowance. That is, Euralair would not have to reimburse the money paid by GE to Euralair, "because in taking the

---

6. In any event, I need not decide whether the Reimbursement Agreement conflicts with Letter Agreement No. 2. The letter agreement cannot be a modification of the Reimbursement Agreement, because Letter Agreement No. 2 predates the other financing agreements by six days. Further, Euralair does not dispute the terms of the Reimbursement Agreement (*see* Answer ¶ 7; Def. 3(g) ¶ 3), and does not dispute that it ignored GE's Prepayment Instruction (*see* Def.Mem. at 15). Therefore, the undisputed facts show that Euralair has breached the Reimbursement Agreement.

7. Euralair also suggests that GE issued the Prepayment Instruction in bad faith by "direct[ly]

contradicti[ng] ... the terms of [GE's] General Agreement with Euralair." Def.Mem. at 15. However, Euralair cites no portion of the "General Agreement" (which is distinct from all of the above-mentioned agreements) in support of this contention. Euralair also argues that Sections 6.2 and 6.3 of the Reimbursement Agreement, which vest in GE sole discretion to issue a Prepayment Instruction, represent bad faith by GE. Def.Mem. at 15. Euralair's claim that the existence of certain provisions in an agreement represent bad faith by one of the signatories is difficult to sustain given that Euralair itself signed the agreement.

place of Euralair, GE would be handsomely compensated by Boeing." Def.Mem. at 10. "[I]f Euralair ... failed to order the GE engine 90–B4, GE would assume the responsibilities of Euralair and take over the contract with Boeing.... GE would receive early delivery of the two 777 aircraft." *Id.*

Euralair essentially argues that the "alternative rights GE has under a Security Agreement between the parties somehow deprived GE of its primary rights under the Reimbursement and Note Purchase Agreements." Pl.Reply Mem. at 3. However, an examination of the Security Agreement reveals otherwise. As stated earlier, through the Security Agreement, GE accepted as collateral a security interest in Euralair's contract with Boeing. The agreement was negotiated on Euralair's behalf by United States and French counsel (*see* Marcu Aff., Ex. 1), and Euralair does not allege that either counsel was incompetent. Section 5.5 of the Security Agreement, entitled "Remedies Cumulative," states that

> Each and every right, power and remedy hereby specifically given to [GE] shall be in addition to every other right, power and remedy specifically given under this Security Agreement or under the other Financing Documents ... and each and every right ... may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by [GE].

The term "Financing Documents" includes the Reimbursement Agreement, the Notes, the Note Purchase Agreement, the Guaranty Agreement, and the Security Agreement. *See* Cplt.Ex. D, § 1. Thus by the terms of the Security Agreement, the fact that the Security Agreement granted GE a certain remedy did not preclude GE from exercising remedies granted under the Reimbursement and Note Purchase Agreements.

In support of its argument, Euralair cites a note from GE to Euralair dated September 17, 1992. In this note, John Berten (the General Manager of GE's International Sales Department) wrote:

> I AM PLEASED TO REPORT THAT OUR LEGAL AND FINANCIAL CONSULTANTS HAVE FINISHED THEIR REVIEW OF THE POSSIBLE IMPACT OF COMPLETING THE ARRANGEMENTS OF OUR GENERAL TERMS AGREEMENT. WITH THIS REVIEW NOW AVAILABLE, WE HAVE MET WITH OUR SENIOR MANAGEMENT, AND HAVE SECURED THEIR AGREEMENT TO PROCEED WITH THE NECESSARY PAPERWORK TO COMPLETE OUR NEGOTIATIONS.
>
> GROUNDWORK ALREADY COMPLETED WITH OUR INVESTMENT BANKER[.] INDICATES THAT THEY WILL BE ABLE TO PROVIDE A FIRST DRAFT LOAN AGREEMENT FOR YOUR INSPECTION WITHIN FIVE WORKING DAYS. SIMIL[ARLY], WE CAN HAVE A DRAFT SECURITY AGREEMENT IN THE SAME LENGTH OF TIME. OUR DRAFT GENERAL TERMS AGREEMENT IS ALREADY PREPARED....[8]

Cutner Aff.Ex. 13. Euralair contends that through this note, "GE agreed to Euralair's pledging its contract with Boeing as security against the payment made to Euralair." Def.Mem. at 9. "Berten's note ... indicates that GE accepted the security agreement proposed by Euralair, granting GE the right to assume Euralair's responsibilities if Euralair failed to fulfill its obligation of placing a firm order for the Spare Engine." *Id.* at 11–12. Even if this note could signify GE's *acceptance* of a security agreement *proposed* by Euralair, the security agreement *signed* by GE and Euralair allowed GE to pursue alternate remedies. Euralair's invocation of the Security Agreement fails to raise an issue of material fact regarding whether Euralair is in default of the Reimbursement Agreement and the Note Repurchase Agreement.

---

8. The rest of the note proposes a time and place for meeting and suggests who should be present at the meeting. The note also states that if Euralair agrees "with this plan," Euralair should indicate its agreement by return fax, "which will serve as an extension of our [GE's] proposal agreement dated August 10, 1992." Cutner Aff. Ex. 13.

### C. The Advance Did Not Have to be Repaid

█ Finally, Euralair contends that GE "assur[ed] [Euralair] that the Introductory Allowance need not be reimbursed by Euralair." Def.Mem. at 3. However, Euralair cites only a single piece of evidence to support its claim that GE made such assurances. That "evidence" is a single page excerpted from a longer document, dated February 10, 1992. See Cutner Aff.Ex. 4. (The page shown is Page 6 and contains no signatures.) The page contains a section entitled "Introductory Allowance" and refers to a $10 million introductory allowance from GE which "will be earned by Euralair, on a pro rata basis, upon delivery of four (4) GE90–B4 engines to TBC for installation on Euralair's two (2) firm 777 aircraft." Id. The context in which Euralair cites this document suggests that the page may be a portion of a proposal from GE for the General Agreement between GE and Euralair regarding the sale of the jet engines. See Def.Mem. at 5–6. Euralair suggests in its brief that GE and Euralair were still negotiating at that point, and that GE was competing with other engine manufacturers for the sale to Euralair. In addition, the next paragraph of the page refers to "[t]his proposal and any contract resulting therefrom ..." Cutner Aff. Ex. 4; see also Def.Mem. at 6 (stating that "on March 10, 1992, GE came back with a new proposal ...").

Assuming that the cited document is a proposal from GE to Euralair, it does not raise a genuine issue of material fact as to whether Euralair breached its agreements with GE. Both the Note Purchase Agreement and the Reimbursement Agreement contain integration clauses. See Cplt.Ex. A, § 13.6 ("Subject to [certain warranties], this Agreement embodies the entire agreement and understanding between the Noteholder and the Paying Agent and [Euralair] and supersedes all prior agreements and understandings relating to the subject matter hereof"); Cplt.Ex. D, § 9.11 ("Other than the terms and provisions contained in the Security Agreement, this Agreement embodies the entire agreement and understanding between [Euralair] and [GE] and supersedes all prior agreements and understandings relating to the subject matter hereof"). However, extrinsic evidence is inadmissible for the purpose of construing integrated agreements. See W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 163, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990) ("when parties set down their agreement in a clear, complete document ... [e]vidence outside the four corners of the document ... is generally inadmissible to add to or vary the writing") (citations omitted).[9]

### V. Affirmative Defense

Euralair asserts the doctrine of promissory estoppel as an affirmative defense. According to Euralair, GE said it would give Eura-

---

9. Euralair's remaining arguments are easily disposed of. Euralair's President, Alex Couvelaire, states that:

> I was told that this $10,000,000 payment on the total $20,000,000 Allowance need not be reimbursed since this amount would be deducted from the Introductory Allowance earned, pro-rata, on Euralair's two GE90–B4 engines upon delivery of four GE90–B4 engines for installation in Euralair's two 777 Boeing aircraft.

Affidavit of Alexandre Couvelaire, annexed as Def.Ex. 19, ¶ 7; see also Def.Mem. at 7 (contending that Couvelaire remembers that the $10 million "would not be a real loan, because Euralair would not have to reimburse it"). However, where, as here, the terms of a contract are unambiguous, "parol evidence is inadmissible to create an ambiguity." Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir.1996) (citing W.W.W. Assocs., 77 N.Y.2d at 162–63, 565 N.Y.S.2d 440, 566 N.E.2d 639). Thus Couvelaire

may not create a triable issue of fact by contradicting the unambiguous terms of a written contract.

Euralair also contends that the evidence demonstrates the existence of a genuine issue of material fact "because" (1) if Couvelaire had not been certain that Euralair could relinquish its contract if it were unable to order a spare GE engine, "he would never have caused Euralair to enter into [a] contract with GE," and (2) GE would not have entered into a contract with Euralair if GE "had not been certain to hold a security from Euralair for allowances GE paid to Euralair." Def.Mem. at 12–13. The second contention is speculative and irrelevant. And while the first contention may be true, it does not change the fact that Euralair did enter into agreements with GE, and that these agreements allowed GE to demand prepayment if Euralair failed to order a spare GE engine by April 30, 1995.

lair "price rebates, financing and credit terms if Euralair purchased two Boeing 777 airplanes, both equipped with two GE jet engines, and placed an order with GE for a spare engine." Answer ¶ 2. Further, GE "relentlessly pursued nego[t]iations" with Euralair, "despite the fact that GE knew Euralair had absolut[e]ly no funds with which to purchase those engines." *Id.* ¶ 4. Euralair refers repeatedly to "statements" made by GE, and alleges that Euralair relied on those statements in accepting the contract and financing agreements with GE. *Id.* ¶ 6; *see also id.* ¶¶ 7–8. However, the only statement alleged by Euralair that addresses the repayment of the $10 million advance is the following: "GE told Euralair that ... Euralair could repay the advance itself, [ ] amounting to $10 million in principal with the funds earned, pursuant to the contract Euralair had with a large French government-owned commercial airline, since plaintiff GE was well aware the defendant, Euralair, had no funds." *Id.* ¶ 2.

Beyond that, Euralair alleges only that "Euralair was under the impression that GE could take back its two engines through its affiliate GECA, a leasing corporation, 100% owned by GE, if the payment of those engines fell into default." *Id.* ¶ 5. Euralair also alleges that "at the time it made those statements, [GE] knew they were false in that GE had inserted a clause in ... the Reimbursement Agreement ... whereby [GE] may, *in its sole discretion*, issue a prepayment instruction...." *Id.* ¶ 7 (emphasis in original). Finally, Euralair contends that "[i]n December 1992, GE had led Euralair to believe that GE would never accelerate the payment of the notes because of the longstanding relationship between the two companies." *Id.* ¶ 10.

The elements of a defense of promissory estoppel are: a clear and unambiguous promise, reasonable and foreseeable reliance on that promise, and unconscionable injury as a result of that reliance. *See City of Yonkers v. Otis Elevator Co.,* 844 F.2d 42, 48 (2d Cir.1988) (applying New York law)

(citing *Ripple's of Clearview, Inc. v. Le Havre Assoc.,* 88 A.D.2d 120, 121–23, 452 N.Y.S.2d 447 (2d Dep't), *appeal denied,* 57 N.Y.2d 609, 456 N.Y.S.2d 1026, 442 N.E.2d 1277 (1982)). Euralair's allegations fail to state a clear and unambiguous promise. Allegations that Euralair was "under the impression" that it would not have to pay back the advance are insufficient. Similarly, a claim that GE told Euralair it could pay back the advance out of its proceeds from Euralair's contract with the government airline does not allege a clear promise by GE that it would not issue a prepayment instruction. While Euralair argues that an "unambiguous promise" is found in John Berten's note dated September 17, 1992 and in other notes discussing the proposed security agreement between GE and Euralair, these notes and letters can in no way be construed as promises by GE not to issue a prepayment instruction. Also, as stated earlier, Euralair has not alleged any modifications to any of the financing agreements.[10]

Absent an allegation of a clear and unambiguous promise, Euralair's affirmative defense is unavailing. However, the affirmative defense fails on the second element as well: while Euralair has alleged that it "entered into the ... financing agreements" in "reliance on [the] words of GE" (Answer ¶ 8), this reliance is not reasonable. The clear language of the Reimbursement Agreement vested in GE the sole discretion to decide whether to issue a prepayment instruction. *See Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 320–21, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959) (specific term of contract "destroy[ed] the allegations" that "agreement was executed in reliance upon ... contrary oral representations") (citation omitted). Therefore, Euralair may not invoke the defense of promissory estoppel. *See R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 78–79 (2d Cir.1984) (summary judgment appropriate in contract case absent allegation of clear promise or reliance).

Because Euralair has failed to raise any genuine issue of material fact regarding its

---

**10.** Each agreement provides that any modifications must be made in writing and signed by all parties to the agreement. *See* Cplt.Ex. A, § 13.3; Cplt.Ex. C, § 11(d); Cplt.Ex. D, § 9.6; Cplt.Ex. E, § 9.13.

obligations under the financing agreements, GE's motion for summary judgment is granted. Euralair must repay GE the $10 million advance, along with interest, expenses and attorneys' fees to be determined by the Court upon application by GE.

## VI. *Motion to Dismiss Euralair's Counterclaim*

### A. *Legal Standard for Motion to Dismiss*

In evaluating a motion to dismiss, a court must accept as true the factual allegations contained in the complaint. *See Cohen v. Koenig*, 25 F.3d 1168, 1171 (2d Cir.1994). All reasonable inferences must be drawn in favor of the non-moving party on such a motion. *See Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991). Moreover, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the [claimant] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

### B. *Substance of Counterclaim*

In its counterclaim, Euralair alleges that "GE breached its obligation of good faith and fair dealing to Euralair in the following respect[s]:"

(a) by suddenly issuing [a] Prepayment Instruction without affording Euralair a reasonable opportunity to find an assignment of the contract or to obtain substitute financing;

(b) by arbitrarily refusing to cooperate with Euralair in any attempt to restructure Euralair['s] financing in a manner which would reduce GE['s] exposure while at the same time assuring Euralair's ability to continue operations;

(c) by issuing Plaintiff's Prepayment Instruction under the Reimbursement Agreement creating an Event of Default under that Agreement and a Default under the Note Purchase Agreement.

Answer ¶ 20. Euralair asserts that GE's "culpable conduct" in issuing a prepayment instruction when "it could have chosen not to do so" was the sole cause of GE's financial losses. *Id.* ¶ 21. Finally, Euralair claims that GE's "irresponsible action" led to Euralair's exposure "to multiple liabilities under the various financing agreements." *Id.* ¶ 22.[11]

### C. *Application of Standard*

In order to state a claim for breach of the implied covenant of good faith and fair dealing, Euralair must allege that GE affirmatively sought to prevent Euralair's performance under or to withhold the benefits of the financing agreements. *See, e.g., Collard v. Incorporated Village of Flower Hill*, 75 A.D.2d 631, 632, 427 N.Y.S.2d 301 (2d Dep't 1980) (dismissing claim for breach of implied covenant of good faith and fair dealing because allegation that defendant acted arbitrarily is not equivalent to allegation that defendant deprived plaintiffs of any benefits to which they were entitled), *aff'd*, 52 N.Y.2d 594, 439 N.Y.S.2d 326, 421 N.E.2d 818 (1981); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 526 (2d Cir.1994) (covenant "only precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement") (internal quotation and citation omitted).

---

**11.** In its brief, Euralair appears to recharacterize its counterclaim as a counterclaim for fraudulent inducement. Def.Mem. at 24. Even if Defendant were granted leave to amend to plead such a claim, it would be dismissed. A claim of fraudulent inducement fails when the alleged misrepresentations conflict with unambiguous terms of the contract at issue. *See Danann Realty Corp.*, 5 N.Y.2d at 320–21, 184 N.Y.S.2d 599, 157 N.E.2d 597 (affirming dismissal of fraudulent inducement claim because specific terms of contract preclude parol evidence of reliance on alleged misrepresentations); *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 94–95, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985) (guarantee to bank that was expressly "absolute and unconditional" could not be avoided by claim that guarantee was fraudulently induced through bank's alleged oral promise to supply additional line of credit). According to Euralair, GE induced it to enter into the financing agreements by promising to pursue remedies only under the Security Agreement in the event of Euralair's default. However, as described in Part IV.B., *supra*, the Security Agreement and the Reimbursement Agreement expressly and unambiguously conflict with this alleged promise by providing that GE's remedies are cumulative and non-exclusive. *See* Cplt.Ex. D, § 7.3; Second Marcu Aff.Ex. 1, § 5.5. Thus a counterclaim by Euralair for fraudulent inducement must fail.

Furthermore, one party may " 'act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract" without breaching the implied covenant. *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir.1990) (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 30 N.Y.2d 34, 46, 330 N.Y.S.2d 329, 281 N.E.2d 142, *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972)). The fact that a party seeks to restructure a financing arrangement when default appears imminent but later elects to enforce its rights under the contract does not constitute a breach of the covenant. *See Rexnord Holdings*, 21 F.3d at 526 (plaintiff did not breach covenant by agreeing to extend time for payment (at defendant's request) in return for release of other unrelated obligations, but subsequently seeking to collect money owed).

Euralair has not alleged that GE did anything to prevent it from performing under their agreements. Nor has Euralair alleged that GE acted to deprive Euralair of the benefits of the agreements. Euralair's contention that GE's decision to issue a prepayment instruction was "irresponsible," "sudden," and "arbitrary" is not equivalent to an allegation that GE prevented Euralair from performing. Rather, Euralair admits that it entered into agreements giving GE the right to issue a prepayment instruction if Euralair did not order a spare engine by April 30, 1995, and requiring Euralair to comply with such a prepayment instruction or be in default of the agreements. Consequently, Euralair has failed to state a claim for breach of the implied covenant of good faith and fair dealing, and its counterclaim must be dismissed.

## VII. *Request for Joinder*

Finally, in its memorandum of law, Euralair requests permission to join the president of Euralair, Alex Couvelaire, as a plaintiff in this action in order to "recover against GE for defamation of his character." Def.Mem. at 29–30. Euralair cites Fed. R.Civ.P. 18 in support of its request. *Id.*

Euralair contends that GE has stigmatized Couvelaire by spreading rumors "throughout the aviation community" and that a "charge of stealing has been publicly disclosed, naming President Couvelaire as [a] thief." Def. Mem. at 29.

Euralair has not followed the correct procedure for requesting joinder of a party. If Euralair wishes to join Couvelaire as a party, it must make a formal motion to do so. But even if Euralair were to so move, the motion would be denied.

In support of its request, Euralair has cited Rule 18, which governs the joinder of claims by parties to the action. Because Couvelaire is not a party to this action, he must look to Rule 20(a), which governs the permissive joinder of parties. Under that rule, permissive joinder is appropriate if a proposed party "assert[s] any right to relief ... arising out of the same transaction, occurrence, or series of transactions or occurrences" underlying the original action. Even if the contentions in Defendant's memorandum were formal allegations, they would not support a finding that Couvelaire's proposed defamation claim arises out of the same transaction or occurrence as GE's breach of contract claims against Euralair. There is no suggestion that the alleged defamation is in any way connected to the alleged breach by Euralair of agreements it made with GE.[12]

## VIII. *Conclusion*

For the reasons stated above, Plaintiff's motion for summary judgment is granted. Euralair must repay GE the $10 million advance, along with interest, expenses and attorneys' fees to be determined by the Court upon application by GE. Further, Defendant's request for joinder is denied, and Plaintiff's motion to dismiss Euralair's counterclaim is granted.

SO ORDERED.

---

12. Even if Euralair meant to allege that GE defamed Couvelaire in its complaint, such a claim would fail because allegations in a complaint are subject to an absolute privilege. *See*

*Vevaina v. Paccione*, 125 A.D.2d 392, 393, 509 N.Y.S.2d 113 (2d Dep't 1986), *appeal denied*, 69 N.Y.2d 607, 514 N.Y.S.2d 1025, 507 N.E.2d 321 (1987).