**M/A-COM SECURITY CORPORATION, Appellee,**

v.

**Francesco GALESI, Appellant.**

**No. 920, Docket 89-9157.**

United States Court of Appeals, Second Circuit.

Argued March 1, 1990.

Decided May 22, 1990.

Charles M. Mattingly (Paul E. Carter, Gaston & Snow, New York City, of counsel), for appellant.

Ira G. Greenberg, Summit Rovins & Feldesman, New York City, for appellee.

Before OAKES, Chief Judge, NEWMAN and WALKER, Circuit Judges.

PER CURIAM:

This is an appeal from an October 19, 1989, judgment of the United States District Court for the Southern District of New York, Robert P. Patterson, Jr., Judge, granting summary judgment in favor of plaintiff M/A–COM Security Corporation ("M/A–COM") in its action to recover on a promissory note issued in connection with M/A–COM's sale of stock in Argo Group, Inc. ("Argo") to defendant-appellant Francesco Galesi. Because we agree with the district court's finding that Galesi had no valid defense for nonpayment of the note, we affirm the grant of summary judgment.

This appeal requires us to consider the scope of the implied covenant of good faith and fair dealing under New York contract law. In September 1985, M/A–COM sold its investment in Argo to Galesi, for which Galesi paid $750,000 in cash and executed a note for over $3.7 million, payable in quarterly installments over four years. Although the principal founder of Argo, a long-distance telecommunications company, Galesi had reduced his share of stock ownership from approximately 55% since Argo's founding to less than 20% at the time of his purchase of stock from M/A–COM.

M/A–COM had originally invested in Argo to cultivate good will and thereby to promote sale of its telecommunications equipment to Argo. Galesi claims that in 1985 a representative of M/A–COM requested that he purchase M/A–COM's stock in Argo so that M/A–COM could show a short-term profit to its own shareholders for the fiscal year ending September 30, 1985. Galesi further asserts that he made the purchase as an accommodation to M/A–COM, since he would have benefited Argo more by investing directly in the company and thus increasing Argo's capitalization than he would have by buying M/A–COM's share in Argo. In exchange for this accommodation, Galesi contends that M/A–COM promised never to oppose Galesi's management strategy for Argo or to take any action undermining the value of Galesi's Argo stock.

M/A–COM disputes that it first approached Galesi, arguing instead that Galesi sought to purchase M/A–COM's stock in order to increase his own share of ownership in and control over Argo. M/A–COM points out Galesi had become increasingly critical of the management of Argo's affairs by Centel Network Company ("Centel") and ALLTEL Corporation, which together in 1985 owned combined stock that represented (on a converted basis) approximately 54% of Argo's voting power.

The sale of Argo stock from M/A–COM to Galesi was executed by a purchase agreement and a promissory note. M/A–COM timely transferred to Galesi the Argo securities as specified in the agreement and the note. Galesi made four quarterly payments in 1985 and 1986 of principal and interest on the note, but ceased to make such payments in or about December 1986. In January 1987, Argo filed a petition for bankruptcy. Following Argo's liquidation, Galesi's $20 million investment in the company became worthless.

Galesi defends his nonpayment of the balance on the note by claiming that M/A–COM's actions subsequent to the exchange of stock had rendered his investment valueless, in violation of M/A–COM's implied covenant of good faith and fair dealing under New York contract law. In particular, Galesi argues that M/A–COM, as a shareholder of Microtel, Inc., an unrelated company in the industry, and through its director on Microtel's board, took action in 1986 which directly had the effect of preventing a proposed merger of Argo with Microtel and LCI Communications, Inc. from going through. Centel and ALLTEL Corporation, the main proponents of the merger, together owned stock representing 55% of the voting power of LCI Communications, and 47% of Microtel's, in addition to their 54% share of Argo's voting power.

Although Galesi himself initially had opposed the proposed merger, he testified that by the end of 1986 he supported the merger, since Argo's financial position was so tenuous that it would fail if it did not merge. Seeking to recover the value of his investment rather than to go down with

Argo in the absence of a merger, Galesi now hoped to exercise his dissenter's right to sell his shares in Argo in the event of a merger.

M/A–COM also changed its position with regard to the proposed merger, but moved in the opposite direction from Galesi. Although M/A–COM had originally supported the merger, it opposed the proposal by the end of 1986 on grounds that the necessary amount of financial backing for the merged entity had not become available. Not content to exercise its dissenter's appraisal right and to allow the underlying merger to go through, M/A–COM, according to Galesi, engaged in a scheme to "lobby." other Microtel shareholders to persuade them to withdraw support for the merger. Once Norfolk Southern Corporation, an allegedly lobbied shareholder, withdrew its support, the merger proposal failed. Galesi contends that M/A–COM acted to prevent the merger even though it was well aware that Argo and Galesi's investment in Argo would become valueless without the merger.

The district court rejected Galesi's defense for non-payment of the note. Holding that the implied covenant of good faith and fair dealing in contract law was not so broad as to preclude M/A–COM from seeking to advance its legitimate business interests in an unrelated transaction, the district court granted M/A–COM's motion for summary judgment.

Although there exists under New York law an implied covenant of good faith and fair dealing, pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract, see *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933), the undisputed facts would not permit a reasonable trier to find that M/A–COM in any way violated its obligations to Galesi under this implied covenant. In general, courts enforce the implied covenant where an implied promise was "so interwoven in the whole writing" of a contract as to be necessary for effectuation of the purposes of the contract. *Hav-*

*el v. Kelsey–Hayes Co.*, 83 A.D.2d 380, 384, 445 N.Y.S.2d 333, 336 (4th Dep't 1981). Similarly, where a party's acts subsequent to performance on the contract so directly destroy the value of the contract for another party that the acts may be presumed to be contrary to the intention of the parties, the implied covenant of good faith may be implicated. *See Roli–Blue, Inc. v. 69/70th Street Assocs.*, 119 A.D.2d 173, 506 N.Y. S.2d 159 (1st Dep't 1986) (landlord's affirmative acts rendering illegal the contemplated use of leased premises may violate an obligation that the parties would have assumed had their attention been drawn to it, and thus may violate implied covenant of good faith and fair dealing under lease agreement).

Integral to a finding of a breach of the implied covenant is a party's action that directly violates an obligation that may be presumed to have been intended by the parties. "[C]ourts employ the good faith performance doctrine to effectuate the intentions of the parties, or to protect their reasonable expectations." Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv.L.Rev. 369, 371 (1980). Contrary to Galesi's contentions, however, the implied covenant does not extend so far as to undermine a party's "general right to act on its own interests in a way that may incidentally lessen" the other party's anticipated fruits from the contract. *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 30 N.Y.2d 34, 46, 281 N.E.2d 142, 145, 330 N.Y.S.2d 329, 334, *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972).

Construing all allegations in the light most favorable to Galesi, the party that opposed the motion for summary judgment, we conclude that M/A–COM neither directly destroyed the value of Galesi's stock, nor engaged in any actions in violation of the parties' presumed intentions or reasonable expectations. Even if Galesi could prove at trial that M/A–COM's lobbying efforts caused the merger between Argo, Microtel, and LCI Communications to fall through, these acts by M/A–COM

would not form an essential link in the chain of events causing Argo's stock to become worthless. The record indicates that Argo's dire need for capital in 1986 was the primary cause of its failure. Unlike the above-cited cases, in which the actions of the party breaching the implied covenant were the sole and direct causes of destruction of the value of the contract for the other party, the chain of causation here between M/A–COM's actions and Argo's bankruptcy is simply too attenuated, given the more direct intervening causes of Argo's failure.

Moreover, although the merger might have saved Argo and prevented Galesi's stock from becoming worthless, nothing in the record suggests that Galesi entered into the transaction with M/A–COM in contemplation or anticipation of the merger. In fact, given that Galesi himself initially opposed the merger, presuming an intention on the part of the parties to impose on M/A–COM the obligation to have supported the merger would be ironic indeed. The district court thus properly rejected Galesi's defense for nonpayment on the note.

Judgment affirmed.