**CARVEL CORPORATION, Plaintiff and Counterclaim Defendant,**

v.

**James BAKER, et al., Defendants and Counterclaim Plaintiffs.**

No. 3:94CV1882 (AVC).

United States District Court, D. Connecticut.

July 22, 1997.

Robert A. Izard, Jr., Christopher John Hug, David T. Ryan, Anne S. Fassler, Robinson & Cole, Hartford, CT, Mitchell A. Karlan, Beth L. Golden, Marshall R. King, Gibson, Dunn & Crutcher, New York City, Richard P. Weinstein, Weinstein & Wisser, P.C., West Hartford, CT, David Kaufman, Kaufmann, Feiner, Yamin, Gildin & Robbins, New York City, Daniel Gildin, New York City, Keith J. Kanouse, Kanouse & Walker, PA, Boca Raton, FL, for Carvel Corporation, plaintiff.

Ross G. Fingold, Levy & Droney, P.C, Farmington, CT, John Soroko, Wayne A. Mack, Mark B. Schoeller, J. Manly Parks, Duane Morris & Heckscher, Philadelphia, PA, for Abdul Aziz Hoodbhoy, John K. Hazelton, Mary Lisa Hazelton, Edward Gromelski, Marcia Finkle, Nelson Finkle, Suleman Hoodbhoy, Dost M. Khemani, John G. Hughes, Beverly A. Papp, Ash Family Trust, Robert A. Morath, Iqbal Naviwala, Estelle McNerney, Pen Li Wang, Christel Scinski, Stanley Sicinski, Josephine Ingenito, Angela Sparacino, Gaspare Sparacino, Peter Marsella, Jerome Lang, Margaret C. Lang, Nasim Athsed Chugtai, Robert Spielman, Joseph A. Rotondo, Paula Rotondo, Valerie Cristiano, Stephen Vangelder, Joseph A. Giampapa, Elizabeth A. Noonan, John D. Noonan, Mildred Miller, Dora Lee Shock, Bruce Mordaunt, Rosemarie Mordaunt, John Schneider, Josephine Ann Schneider, Carlton K. Harding, Judith M. Harding, Anthony Iaquinta, Frank Iaquinta, MD, Kenneth Mounts, Shirley Mounts, Burton G. Fischer, Lynn Kohler, Robert Kohler, Don Roggie Siclait, Wilfrid Siclait, Ismail Tawfik, Noor J. Tawfik, Maria Capodieci, Randy hyde, Robert Noorigian, Geraldine McCormack, Vincent Valva, Stephen Kwacz, All Conpla, consolidated plaintiffs.

Ross G. Fingold, Levy & Droney, P.C, Farmington, CT, John Soroko, Wayne A. Mack, Mark B. Schoeller, Thomas P. Cas-

sidy, J. Manly Parks, Duane Morris & Heckscher, Philadelphia, PA, Keith J. Kanouse, Kanouse & Walker, PA, Boca Raton, FL, for Jerry Capodieci, Carol Guadagno, Chin Tien Hsieh, Margaret Y.M. Hsieh, Diane Humphrey, Christine Liberti, Hugo Liberti, Mary H. Lisa, Robert T. Maida, Jeanne V. Marsella, George M. Piquette, Jr., Ketki P. Shah, Pankaj Shah, Douglas Casavant, Barbara Casavant, John Lynch, Catherine Lynch, Nasim Arhsed Chugtai, H. Martin Popiel, Joyce Popiel, Armand Liguori, Michael Bailey, Denise Bailey.

### RULING ON THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

COVELLO, Chief Judge.

This is an action for declaratory judgment. It is brought pursuant to 28 U.S.C. § 2201, and concerns the validity of the plaintiff's wholesale ice cream distribution program (hereinafter "the supermarket program"). By way of amended counterclaim, the defendants aver that the supermarket program violates various state statutory prohibitions against unfair trade practices, and common law tenets concerning tortious interference with business relationships, fraudulent concealment, and breach of contract. The amended counterclaim seeks damages, declaratory and injunctive relief. Carvel asserts, and the defendants do not dispute, that New York law governs the action to the extent that it relates to the performance of their agreements.

Carvel now moves for summary judgment on its claim for declaratory relief to the effect that its supermarket program does not violate its franchise agreements with the defendants.

The issues presented are: 1) whether the supermarket program violates the express terms of Carvel's Type A franchise agreement; 2) whether the supermarket program violates the Type A franchise agreement's implied covenant of good faith

and fair dealing; 3) whether the supermarket program violates the express terms of Carvel's Type B franchise agreement; and 4) whether the supermarket program violates the Type B franchise agreement's implied covenant of good faith and fair dealing.

For the reasons hereinafter set forth, the motion is granted in part, and denied in part.

### FACTS

Examination of the complaint, affidavits, local rule 9(c) statements, and other supporting materials accompanying the motion for summary judgment, and the responses thereto, disclose the following undisputed, material facts. The plaintiff and counterclaim defendant, Carvel Corporation (hereinafter "Carvel"), is a Delaware Corporation having its principal place of business in Farmington, Connecticut. Since 1934, Carvel has been in the business of producing and selling specialty ice cream cakes and frozen desserts. In 1947, Carvel began franchising others to operate separately standing Carvel ice cream stores, and to sell at retail Carvel ice cream and other frozen dessert products. The defendants and counterclaim plaintiffs are several Carvel ice cream store franchisees or co-franchisees (hereinafter "the defendants"), situated in several states along the eastern seaboard, including Connecticut, New York, Florida, New Jersey, Pennsylvania, Massachusetts, Rhode Island, and New Hampshire. Currently, there are approximately 435 Carvel stores nationwide, both company owned and franchised. The defendants comprise approximately 11% of Carvel's franchisees.

Under the Carvel franchise system, Carvel sells a liquid dairy mix by the gallon to its franchisees. The franchisees manufacture Carvel ice cream on their premises by feeding the mix into machines, and then sell the finished product to the public. In order to become a part of the franchise system, franchisees are required

to pay an initial licensing fee of between $10,000 and $25,000 dollars. In addition, the franchisees are required to purchase Carvel equipment and pay a royalty and an advertising fee on each liquid gallon of mix. The advertising and royalty payments are calculated based upon a minimum annual gallonage (typically 10,000 gallons of mix), with a requirement that the franchisee pay a minimum mix surcharge regardless of the amount of mix actually consumed by the store.

Traditionally, Carvel stores (both company owned and franchised) were the only authorized retail outlets for Carvel products. Supermarkets, convenience stores, restaurants and other frozen dessert retail stores were not authorized to sell Carvel ice cream. Both Carvel and the defendants viewed such venues as their direct competitors in the specialty ice cream market.[1] As of 1990, Carvel's chief executive officer, Steve Fellingham, had assured franchisees that Carvel had no plans to enter the supermarket business due to the devastating effect such a policy would have on its franchisees.[2]

In the Fall of 1992, Carvel entered the supermarket business. Carvel adopted the "branded freezer program", whereby it began selling its products out of branded freezers in Pathmark supermarkets in New Jersey. According to Steve Felling-

ham, the branded freezer program was only a "test" to see whether the products would sell in supermarkets, and if sales were successful, Carvel products would only be made available in areas of the country where there were no pre-existing Carvel franchise stores.

In April 1993, over the defendants' objections, Carvel announced that it was establishing a "Cooperation Policy for Supermarket Expansion" (hereinafter the "AOI Policy"). Under this policy, Carvel envisioned selling its products in branded freezers in the same market areas as existing franchisees, but not within any franchisee's exclusive territory. The AOI policy allowed approved dealers (including franchisees), to sell their products through branded freezers at approved locations within the dealers "area of inclusion", that is, an area with a radius of 5 miles from the Carvel store or within an area containing a population of 25,000. In order to participate in the AOI program, a dealer had to purchase its own freezers at a cost of $5,000 per freezer.

On June 30, 1994, over the defendants' objections, Carvel announced that it was expanding its wholesale distribution of ice cream through a method called the "Supermarket Route Program." The program was designed to increase distribution of Carvel products to supermarkets, conve-

---

1. See 1988 Carvel Uniform Franchise Offering Circular, which provides,

   *Carvel Ice Cream Factorys (sic) and Satellite Stores typically compete with all other vendors of ice cream and other frozen desserts, including, but not limited to, supermarkets and other ice cream and frozen dessert stores.* The name "Carvel" has been associated with the ice cream business since 1934, and the firm was incorporated as a New York Corporation in 1946, and since 1947 has conducted the form of business presently conducted by the company including, the granting of licenses to individuals to operate the retail Carvel Ice Cream Factories. The Company has licensed Satellite Stores since 1975. In 1969, the Company was reincorporated as a Delaware corporation in connection with the public sale of its common stock. From time to time, the Company also operates a few Carvel Ice Cream Factories and Satellite Stores similar to the type being offered to the Licensee *... The Company has not offered licenses to other lines of business* (emphasis added).

2. The minutes of the 12/14/90 Chairman Advisory Board Meeting state as follows,

   Q. [Chairman Advisory Board Participants] We hear Carvel is going into the ice cream manufacturing and supermarket distribution?

   A. [Fellingham] "No". We are not in ice cream manufacturing or the supermarket business and have no plans to enter this market. The Haagen–Dazs retail shop business was ruined by entering the supermarkets and I see the same happening to Carvel. That's why we are not headed in that direction.

nience stores, and other approved wholesale accounts. Under the program, Carvel secures contracts with major supermarkets to supply Carvel ice cream at certain wholesale prices. The Carvel franchisees closest to those supermarkets are afforded the opportunity to fulfill those contracts as route dealers. Carvel estimates that the total initial investment to participate as a route dealer is approximately $34,500 – $65,000. Both the AOI policy and the Supermarket Route Program comprise the supermarket program.

Carvel products sold under the supermarket program are advertised, marketed and promoted by Carvel, subsidized by Carvel through coupon redemption, and in some cases offered at prices that are significantly lower than the prices for the same products in franchise stores. While Carvel permits its franchisees to participate in the supermarket program, the defendants herein claim that they cannot afford to expend the additional sums, time and effort required for participation, and cannot make a reasonable profit selling their products at the wholesale prices set by Carvel.

The defendants claim they never expected that Carvel would compete with them for sales and revenue by supplying supermarkets and other accounts at wholesale. Rather, the defendants claim that at the time they purchased their respective franchises, there was an expectation that the franchise system would remain the exclusive means for Carvel ice cream distribution. Absent this expectation, the defendants claim they would not have purchased their franchises.

Carvel, on the other hand, claims that it created the supermarket program out of necessity. Specifically, Carvel claims that the supermarket program was (and is) calculated to respond to the consumer trend of purchasing ice cream mainly in supermarkets. This trend, Carvel argues, has caused a dramatic decline in Carvel store customer traffic over the past ten years. In support thereof, Carvel points out that from 1988 to 1993, the number of Carvel stores decreased from 650 to 435, and of those stores that remained, sales steadily declined.[3] In further support of its claim, Carvel points to an undated study it commissioned, with the defendants' endorsement, to render an opinion regarding the necessity of the supermarket program. The study, performed by a group of franchise consultants known as the Feltenstein & Feltenstein Group, concluded that,

> Given the state of the frozen dessert business in general and Carvel in particular, there is no question in our mind that the strategy under discussion (the supermarket program) is totally necessary if Carvel is to survive as a brand over the next decade.

The Feltenstein & Feltenstein Group, *Carvel Marketing Review* (undated).

The franchise agreements existing between Carvel and the defendants are dispositive of Carvel's rights and liabilities in connection with the supermarket program. Carvel has licensed its franchisees through two forms of agreement that are at issue herein. The first is the 1984 form of franchise agreement (hereinafter the "Type A agreement"), and the second is the 1992 form of franchise agreement (hereinafter the "Type B agreement").

The Type A agreement contains, *inter alia*, an "Acknowledgements" paragraph that contemplates the existence of a "unique system for the production, distribution, and merchandising of Carvel products", specifically stating that,

> *The parties acknowledge and agree that there has been created a unique system for the production, distribution and merchandizing of Carvel products ...* These high quality (Carvel) products are sold in fine sanitary stores created in accordance with exclusive designs and specifications also originated by the

---

**3.** Carvel states that the number of gallons of mix purchased per store "declined from 7,330 gallons per store in 1987 to 6,120 gallons per store in 1992."

owner of the Carvel trademarks, and the public has been accustomed to seek and purchase Carvel products at these unique stores which are hereinafter referred to as "Carvel Stores." These Carvel stores operate under the name "Carvel" and under the Carvel trademarks which cover not only the products manufactured and sold at these unique stores, but also the type of retail store at which the products are sold (emphasis added).

The "Acknowledgements" paragraph also contains a "reservation of rights clause." The clause specifically provides that the franchisee is afforded,

[o]nly with a limited license to manufacture and sell certain specified Carvel products at retail and only, and only from the unique type of retail store specified herein as a Carvel store. *All other rights in and to the names "Carvel" and the Carvel trademarks are reserved to Carvel as the owner of that name and those trademarks* (emphasis added).

The Type A agreement further provides the franchisee with territorial protection that is limited to ¼ mile up and down the street from the Carvel store, specifically stating that,

THIRTEENTH: So long as Licensee complies with all of the terms of this Agreement, Carvel agrees that it will not establish or license another person to establish a Carvel Store on [street address of Carvel Store] for the sale of Carvel products, within ¼ of a mile on said street in either direction from the Carvel Store.

Finally, each defendant that executed a Type A agreement received, at least 10 days in advance of execution, a Carvel Uniform Franchise Offering Circular containing the following narrative in Item 12 thereof,

The Carvel Retail Manufacturer's License is a limited license to manufacture and sell Carvel products at retail only

from a Carvel ice cream factory at a specified location approved by the Company, and it expressly provides that as long as the Licensee fully and faithfully performs the obligations of his license, the Company will not establish or license a Carvel retail unit on the same street on which the Licensee's Carvel Ice Cream Factory is situated for a distance of ¼ mile in either direction on the same street. The Licensee has no other exclusive or territorial rights, and no options or rights with respect to additional Carvel Ice Cream Factories.

In 1992, the plaintiff abandoned its Type A form of franchise agreement and introduced the modified, Type B form of agreement. The Type B agreement preserves the Type A agreement "Acknowledgements" paragraph cited above concerning Carvel's "unique system for the production, distribution, and merchandising of Carvel products" and Carvel's "reservation of rights." However, unlike the Type A agreement, the Type B contract provides for alternative distribution, and eliminates the prior guarantee to the franchisee of territorial protection, stating that,

THIRTEENTH: The license granted to Licensee hereunder is non-exclusive, and Carvel, in its sole and absolute discretion, has the right (i) to grant other licenses in, to and under the Carvel trademarks in addition to those already granted, both within and outside Licensees trading area, (ii) to develop and license other names and trademarks on any such terms and conditions as Carvel deems appropriate, and (iii) to sell or license to sell products under Carvel trademarks or otherwise through the same or different delivery systems or other distribution channels or concepts.

Each defendant that executed a Type B agreement received, at least 10 days in advance of execution, a Carvel Uniform Franchise Offering Circular containing the following narrative in Item 12 thereof,

The Carvel Retail Manufacturer's License and Carvel Branch Unit Rider are limited licenses to manufacture and sell Carvel products at retail only from a Carvel Ice Cream Bakery or Branch Unit at a specified location approved by the Company. *Such licenses are non-exclusive, and the company, in its sole discretion, has the right to grant other licenses under its trademarks, both within and outside the Licensee's trading area, and to sell or license others to sell products under the Carvel trademark or otherwise through the same or different delivery systems or other channels or concepts.* These may include, for example, mail order systems, or outlets located in stadiums, arenas, airports, turnpike rest stops, *supermarkets* and malls (emphasis added).

### STANDARD

Summary judgment is appropriately granted when the evidentiary record shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether the record presents genuine issues for trial, the court must view all inferences and ambiguities in a light most favorable to the non-moving party. See *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). A plaintiff raises a genuine issue of material fact if "the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rule 56(c) "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Liberty Lobby, supra*, at 247–48, 106 S.Ct. 2505 (emphasis original). The Supreme Court has noted that:

Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis. *Celotex v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims ... [and] it should be interpreted in a way that allows it to accomplish this purpose." *Celotex v. Catrett*, 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### *DISCUSSION*

#### I

#### *The Type A Agreement*

1. *Express Provisions*

■ Carvel first argues that the supermarket program does not violate any of the provisions of its Type A agreement because Carvel guaranteed to the franchisees at paragraph 13 therein only that it would not establish other *Carvel stores* within a ¼ mile up and down the street from the Carvel store franchise. Since supermarkets, convenience stores, and other retail locations are not "Carvel Stores", and Carvel explicitly reserved all other rights, Carvel asserts that it may distribute Carvel products to such outlets without violating the agreement.

The defendants respond that Carvel is not entitled to summary judgment in that there is nothing in the agreement that expressly and affirmatively authorize Carvel to manufacture, distribute, and sell Carvel products a wholesale prices in direct competition with its franchisees, contrary to, *inter alia*, the "unique system" language in the agreement.

■ The court concludes that the issue of whether the supermarket program

is authorized by the agreement is sufficiently ambiguous to preclude summary judgment. Under New York law, if a contract is unambiguous on its face, its interpretation is a question of law and the rights of the parties under the contract may be determined on a motion for summary judgment. *American Express Bank, Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 562 N.Y.S.2d 613, 614 (1st Dep't 1990); *see also Fulton Cogeneration v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 98 (2d Cir.1996) (summary judgment is appropriate "where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning"). However, if a contract is ambiguous, the court may refer to extrinsic evidence to determine the intent of the parties. If the extrinsic evidence leads to conflicting interpretations of the contract, a genuine issue of material fact remains and summary judgment must be denied. *Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 528 (2d Cir. 1990).

> The court's objective in construing the terms of a contract is to give effect to the intention of the parties. As the New York Court of Appeals has stated, "in searching for the probable intent of the parties, lest form swallow substance, our goal must be to accord the words of the contract their fair and reasonable meaning ... Put another way, the aim is a practical interpretation of the expressions of the parties to the end that there be a realization of [their] reasonable expectations."

*Alternative Thinking Systems v. Simon & Schuster*, 853 F.Supp. 791, 795 (S.D.N.Y. 1994) *citing Sutton v. East River Savings Bank*, 55 N.Y.2d 550, 435 N.E.2d 1075, 1078, 450 N.Y.S.2d 460, 463 (1982). "In order to give full effect to the parties expectations, the court must read the con-

tract as a whole and arrive at a construction which will give fair meaning to *all* of language employed by the parties ..." *Alternative Thinking Systems v. Simon & Schuster*, 853 F.Supp. 791, 795 (S.D.N.Y. 1994) *citing Tantleff v. Truscelli*, 110 A.D.2d 240, 493 N.Y.S.2d 979, 983 (N.Y.A.D.1985) (emphasis original) *aff'd*, 69 N.Y.2d 769, 505 N.E.2d 623, 513 N.Y.S.2d 113 (1987). *See also Hanson v. McCaw Cellular Communications, Inc.*, 77 F.3d 663, 668 (2d Cir.1996) ("A contract must be construed as a whole and the intention of the parties must be ascertained from the consideration of the entire contract, not some isolated portion").

In this case, unlike Carvel has argued, the issue is not the degree of territorial protection afforded the franchisee by way of paragraph 13 [4] of the agreement. Paragraph 13 affords a franchisee territorial protection only against other Carvel stores. Since supermarkets, convenience stores, and other retail location are not Carvel stores, the provision is inapplicable to the supermarket program. Rather, the issue presented is the extent to which, if at all, the reservation of rights clause authorizes the supermarket program. Since Carvel's right to establish such a program is no where expressed, Carvel must have unambiguously reserved this right in order to prevail on its motion for summary judgment.

The opening sentence of the "Acknowledgments" paragraph is dispositive of the extent to which the "reservation of rights clause" authorizes the supermarket program. The "Acknowledgements" paragraph states the following,

> The parties acknowledge and agree that there has been created a unique system for the production, distribution and merchandizing of Carvel products ...
> These high quality (Carvel) products are

---

4. Paragraph 13 of the Type A agreement provides,

THIRTEENTH: So long as Licensee complies with all of the terms of this Agreement, Carvel agrees that it will not establish or

license another person to establish a Carvel Store on [street address of Carvel Store] for the sale of Carvel products, within ¼ of a mile on said street in either direction from the Carvel Store.

sold in fine sanitary stores created in accordance with exclusive designs and specifications also originated by the owner of the Carvel trademarks, and the public has been accustomed to seek and purchase Carvel products at these unique stores which are hereinafter referred to as "Carvel Stores." These Carvel stores operate under the name "Carvel" and under the Carvel trademarks which cover not only the products manufactured and sold at these unique stores, but also the type of retail store at which the products are sold ... The parties further acknowledge that *this Agreement provides Licensee only with a limited license to manufacture and sell certain specified Carvel products at retail and only, and only from the unique type of retail store specified herein as a Carvel store. All other rights in and to the names "Carvel" and the Carvel trademarks are reserved to Carvel as the owner of that name and those trademarks* ("reservation of rights clause") (emphasis added).

(emphasis added). While this provision does speak to a reservation of rights, the right to distribute ice cream to vendors other than its franchisees contradicts that portion of the "Acknowledgements" section that expressly contemplates "a *unique system* [between Carvel and franchisee] for the production, distribution, and merchandizing of Carvel products." Given this inherent conflict, the court declines to imply from the agreement any right that authorizes Carvel to distribute, at wholesale, ice cream to vendors who are outside the "unique system". Accordingly, Carvel's motion for summary is denied to the extent that the supermarket program does not violate the express terms of the Type A agreement.[5]

**5.** Since the language of the agreement is susceptible to more than one meaning, the law authorizes the court to examine extrinsic evidence to ascertain the intent of the parties. *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 528 (2d Cir.1990). *See also Chi-*

### 2. Implied Covenant of Good Faith & Fair Dealing

Carvel next argues that it is entitled to judgment as a matter of law on its claim that it has not violated the Type A agreement's implied covenant of good faith and fair dealing. Specifically, Carvel argues that as a matter of law, the implied covenant does not apply to these facts, and in any event, Carvel could not have "possibly[ ] violated the 'Implied Covenant' by implementing the [supermarket program], since [the] defendants' own expert [i.e., the Feltenstein & Feltenstein Group] predicted that the Carvel System would die absent said implementation." Further, Carvel argues that it has acted in good faith, in that the supermarket program is predicated on franchise participation, and was so formulated to save the franchise system.

The defendants respond that the implied covenant does apply, and that "Carvel has breached its contracts and the implied covenant of good faith and fairness by directly supplying products in the franchisees' market areas at predatory prices, by favoring the supermarket program over the dealers with marketing, advertising and coupons, and by failing to provide competent management and support for the dealers, among others."

■ Based upon the following, the court concludes that the implied covenant of good faith and fair dealing applies to the instant case, and that the defendants have raised a genuine issue of material fact that Carvel has violated the covenant.

[T]here exists under New York law, an implied covenant of good faith and fair dealing, pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the

*mart Assocs. v. Paul,* 66 N.Y.2d 570, 572–73, 498 N.Y.S.2d 344, 489 N.E.2d 231 (1986). However, since discovery has not yet closed in this matter, the court leaves for another day the task of constructing that intent.

right of the other party to receive the fruits of the contract.

*M/A–COM Security Corporation v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990) *citing Kirke La Shelle Co. v. Paul Armstrong Co.,* 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933). "The covenant is violated when a party to a contract acts in a manner that although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under the agreement." *Don King Productions, Inc. v. Douglas,* 742 F.Supp. 741, 767 (S.D.N.Y.1990) (citations/internal quotation marks omitted). "Integral to a finding of a breach of the implied covenant is a party's action that directly violates an obligation that may be presumed to have been intended by the parties. Courts employ the good faith performance doctrine to effectuate the intentions of the parties, or to protect their reasonable expectations." *M/A–COM Security Corporation v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990) (citations/internal quotation marks omitted). "No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship." *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 448 N.E.2d 86, 461 N.Y.S.2d 232 (1983).

The supermarket program is not expressly forbidden by any provision in the agreement, nor is it expressly authorized.[6] A genuine issue of material fact exists as to whether the supermarket program violates the express terms of the Type A agreement. Accordingly, the implied covenant of good faith and fair dealing applies, precluding each party from depriving the other of the right to receive the benefits under the agreement. The benefit afford-

ed Carvel includes, among other things, initial licensing fees between $10,000 and $25,000 dollars, and royalty and advertising fees on each gallon of liquid mix sold to the franchisee. The benefit afforded the defendants, includes, among other things, participation in a "unique system for the production, distribution, and manufacturing of Carvel products."

It is reasonable to presume that the parties intended that the "unique system" would preclude Carvel from distributing Carvel products, at wholesale, to supermarkets, convenience stores, and other retail locations. This presumption is supported by the extrinsic evidence produced to date. Specifically, at the time the parties executed the Type A agreement, Carvel had, for decades, conducted business exclusively through its company owned stores and its franchisees. Carvel considered supermarkets and other ice cream stores as direct competitors, had not offered licenses to other lines of business, and as late as 1990, Carvel's chairman, Steve Fellingham, had assured franchisees that Carvel had no plans to enter the supermarket business. It is therefore reasonable that the parties expected that the benefit accruing to the defendants would include a unique relationship with Carvel, to the exclusion of supermarkets, convenience stores, and other retail locations. Under this construction, then, the supermarket program deprives the defendants of their right to receive the benefits of the agreement.

The issue of whether the defendants have otherwise acted in good faith is also unsettled. Carvel's assertion that, as articulated by the Feltenstein & Feltenstein

6. "Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.' Although courts often refer to the obligation of good faith that exists in every contractual relation, this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document. "Good faith" is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of the drafting, and which therefore was not resolved explicitly by the parties. *When the contract is silent, principles of good faith ... fill the gap.* They do not block use of terms that actually appear in the contract." *Kham & Nate's Shoes No.2 v. First Bank,* 908 F.2d 1351, 1357 (7th Cir.1990).

Group study, "the supermarket program is totally necessary if Carvel is to survive as a brand over the next decade," is not conclusive of a finding of good faith. Distribution to supermarkets may in fact be necessary, but the terms and conditions of the supermarket program, as they relate to the defendants, are not. The court also declines to conclude that Carvel has implemented the supermarket program in good faith simply because it has invited its franchisees to participate in the program. Certainly, such franchisee participation is conditioned upon, not only Carvel's consent, but the franchisee's ability to pay thousands of dollars in route dealer start-up costs and assent to new contract terms. Accordingly, a genuine issue of material facts exists as to the nature of the obligations and benefits intended by the parties, and as to whether Carvel has implemented the supermarket program in good faith. The court, therefore, denies Carvel's motion for summary judgment to the extent that the supermarket program does not violate the implied covenant of good faith and fair dealing as it relates to the Type A agreement.

## II

### The Type B Agreement

#### 1. Express Provisions

■ Carvel next asserts that the supermarket program does not violate any of the express provisions of its Type B agreement. Specifically, Carvel argues that it may distribute Carvel products at wholesale to supermarkets, convenience stores, and other retail outlets without violating the agreement, since the agreement does not afford the franchisee any form of territorial protection, and unambiguously reserves Carvel's right to sell Carvel ice cream products through other distribution channels. Further, Carvel argues that through paragraph 13 of the agreement, and by way of its Uniform Franchise Offering Circular, Carvel twice informed the

defendants of the agreement's limited territorial protection.

The defendants respond that the supermarket program does violate the Type B agreement. Specifically, the defendants argue that, "nothing in [the agreement] expressly reserves any right or even specifically mentions Carvel's ability to sell through supermarkets or otherwise compete directly with [the defendants] by making products and selling them to supermarkets, which in turn sell to consumers in the defendants local market areas." Further, the defendants argue that while the Type B agreement does reserve to Carvel the right to "alternative distribution", no right is reserved for "dual distribution", that is, the right to distribute in the same market areas. The "alternative distribution" language, the defendants argue, implies only that Carvel will target new, non-competitive areas for distribution.

The court agrees with Carvel that the supermarket program does not violate the express provisions of the Type B agreement.

> Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed ... A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear an unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case.

*Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir.1992) (citations/internal quotation marks omitted). In this case, the Type B agreement preserves the Type A agreement "Acknowledgements" paragraph that provides for a "unique system for the production, distribution, and merchandising of Carvel products", and Carvel's "reservation of rights clause." However, unlike the Type A agreement, the Type B agreement specifically states the following,

THIRTEENTH: The license granted to Licensee hereunder is *non-exclusive*, and Carvel, in its sole and absolute discretion, has the right (i) *to grant other licenses in, to and under the Carvel trademarks in addition to those already granted, both within and outside Licensees trading area,* (ii) to develop and license other names and trademarks on any such terms and conditions as Carvel deems appropriate, and (iii) *to sell or license to sell products under Carvel trademarks or otherwise through the same or different delivery systems or other distribution channels or concepts* (emphasis added).

While the Type B agreement does contain the same "unique system" language as the Type A agreement, the Type B agreement expressly reserves Carvel's right to grant "other licenses in, to and under the Carvel trademarks in addition to those already granted, both within and outside [the] Licensees trading area ... [and] to sell products under Carvel trademarks through ... different delivery systems or other distribution channels." This provision unambiguously allows Carvel to implement the supermarket program. Moreover, to the extent that any ambiguity may be argued to exist, extrinsic evidence in the form of Carvel's Uniform Franchise Offering Circular, received by each of the defendants prior to execution, unambiguously affirms Carvel's reservation of rights, specifically stating in Item 12 that,

The Carvel Retail Manufacturer's License and Carvel Branch Unit Rider are limited licenses to manufacture and sell Carvel products at retail only from a Carvel Ice Cream Bakery or Branch Unit at a specified location approved by the Company. *Such licenses are non-exclusive, and the company, in its sole discretion, has the right to grant other licenses under its trademarks, both within and outside the Licensee's trading area, and to sell or license others to sell products under the Carvel trademark or otherwise through the same or different delivery systems or other channels or concepts.* These may include, for example, mail order systems, or outlets located in stadiums, arenas, airports, turnpike rest stops, *supermarkets* and malls (emphasis added).

Accordingly, Carvel's motion for summary judgment is granted to the extent that the supermarket does not violate the express terms of the Type B agreement.[7]

---

7. *See Rosenberg v. Pillsbury Company,* 718 F.Supp. 1146, 1157 (S.D.N.Y.1989). In this case, a franchisee brought an action for breach of a franchise agreement against the franchisor, Haagen–Dazs, in connection with Haagen–Dazs' program of distributing prepackaged pints of ice cream to supermarkets and convenience stores. In granting summary judgment to Haagen–Dazs, the court rejected the franchisee's argument that Haagen–Dazs had breached the express terms of the franchise agreement by distributing ice cream to "an exploding number of supermarkets and convenience stores." Specifically, the court concluded,

The franchise agreement explicitly reserves Haagen–Dazs' right to "distribute products identified by the Haagen–Dazs trademark through not only Haagen–Dazs [franchise] Shoppes but through *any other distribution method* which from time to time may be established" (citation omitted). This provision *unambiguously* allows Haagen–Dazs to distribute prepackaged pints of ice cream through supermarkets and convenience stores, especially in light of the fact that Haagen–Dazs historically distributed prepackaged pints long before the advent of the franchise shoppes, a practice plaintiff's admit they were aware of before signing the franchise agreement.

(emphasis added) *Id.* at 1157. *Rosenberg* may be distinguished from the instant case in that the extrinsic evidence offered here does not reveal a history of ice cream distribution to supermarkets and other retail outlets prior to execution of the franchise agreement. However, the extrinsic evidence offered in this case does reveal that Carvel sent to its franchisees, prior to their executing the Type B agreement, a Uniform Franchise Offering Circular that clearly delineates Carvel's right to alternative distribution. "[W]here the express intention of contracting parties is clear, a contrary intent will not be created by implication." *Id.* at 1157 *citing Neuman v. Pike,* 591 F.2d 191, 194 (2d Cir.1979) (applying New York law).

### 2. *Implied Covenant of Good Faith & Fair Dealing*

Carvel next argues that it is entitled to judgment as a matter of law on its claim that it has not violated the Type B agreement's implied covenant of good faith and fair dealing. Specifically, Carvel argues that it has not breach the implied covenant because the covenant cannot be used to vary or contradict the express terms of the Type B agreement. The defendants respond that "even if Carvel is correct in arguing that the Type B agreement gives Carvel discretion to distribute through alternative channels in a franchis[ee's] market, Carvel's exercise of its discretion is nonetheless subject to a reasonableness test under the implied covenant". Carvel has breached the implied covenant, the defendants argue, by acting "arbitrarily, capriciously, and contrary to the spirit of its franchise agreements, by compromising the retail operations of its franchisees in order to pursue [its] own wholesale operation."

Based upon the following, the court concludes that the defendants have raised a genuine issue of material fact that the supermarket program violates the Type B agreement's implied covenant of good faith and fair dealing. As previously discussed,

> [T]here exists under New York law, an implied covenant of good faith and fair dealing, pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

*M/A–COM Security Corporation v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990) *citing Kirke La Shelle Co. v. Paul Armstrong Co.,* 263 N.Y. 79, 87, 188 N.E. 163, 167

**8.** *See Burger King Corporation v. Austin,* 805 F.Supp. 1007 (S.D.Fl.1992) referring to an "oft-cited case in this area", *Dayan v. McDonald's Corp.,* 125 Ill.App.3d 972, 81 Ill.Dec. 156, 466 N.E.2d 958 (1984), that describes the implied covenant of good faith in this situation,

(1933). "Since the duty of good faith and fair dealing is implied in every contract, contracting parties fields of *discretion* under a contract are bounded by the parties' mutual obligation to act in good faith." *Cross & Cross Properties, Ltd. v. Everett Allied Co.,* 886 F.2d 497, 502 (2d Cir.1989) (emphasis added). "[W]hen a contract confers decision making power on a single party, the resulting *discretion* is nevertheless subject to an obligation that it be exercised in good faith." *Travellers International v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1575 (2d Cir.1994) (emphasis added). "A party's actions may implicate the implied covenant of good faith when it acts so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties." *Bank of China v. Chan,* 937 F.2d 780 (2d Cir.1991). *See also Carvel Corp. v. Diversified Management Group,* 930 F.2d 228, 232 (2d Cir. 1991) (even if one party to a contract acts within the bounds of discretion, that party may nevertheless be found to have breached the implied covenant if it acted unreasonably). "No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship." *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 448 N.E.2d 86, 461 N.Y.S.2d 232 (1983).

In this case, the court need not issue a ruling that in any way challenges Carvel's assertion that the covenant of good faith cannot be implied in derogation of the express terms of the Type B agreement. Rather, the question pending here involves the implied covenant of good faith in a contract that grants one party to the contract, Carvel, the discretion to make certain material decisions.[8]

> [T]he doctrine of good faith performance imposes a limitation on the exercise of discretion vested in one of the parties to a contract ... In describing the nature of that limitation the courts of this State have held that a party vested with contractual discretion must exercise that discretion reasonably and with proper motive, and may not

Paragraph 13 of the Type B agreement states,

> THIRTEENTH: The license granted to Licensee hereunder is non-exclusive, and Carvel, *in its sole and absolute discretion,* has the right (i) to grant other licenses in, to and under the Carvel trademarks in addition to those already granted, both within and outside Licensees trading area, (ii) to develop and license other names and trademarks on any such terms and conditions as Carvel deems appropriate, and (iii) *to sell or license to sell products under Carvel trademarks or otherwise through the same or different delivery systems or other distribution channels or concepts* (emphasis added).

The court cannot conclude that Carvel has exercised its "absolute discretion ... [to sell through] other distribution channels" reasonably and in good faith. While Carvel has the discretion to institute an alternative distribution program, the defendants could have reasonably expected, at the time of contracting, that Carvel would not use such a system to compete directly against them, especially since distribution to supermarkets and other retail outlets was not a practice that existed prior to the agreement. While the defendants are not entitled to abrogate Carvel's right to "sell or license to sell products under Carvel trademarks ... through the same or different delivery systems", the defendants are entitled to expect that Carvel will not act to destroy the right of the defendants to enjoy the fruits of the contract.

### CONCLUSION

For the forgoing reasons, Carvel's motion for summary judgment on its claim for declaratory relief is granted only to the extent that the supermarket program does not violate the express terms of the Type

do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

B agreement. The motion is denied in all other respects.

*Id.* at 1013 (citation omitted).