*Schweizer v. Sikorsky Aircraft Corp.*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

# <u>SUMMARY ORDER</u>

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT.  CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1.  WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER").  A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 18th day of December, two thousand fifteen.

PRESENT:
> ROBERT A. KATZMANN,
> *Chief Judge*,
> RALPH K. WINTER,
> JOHN M. WALKER, JR.,
> *Circuit Judges*.

---

PAUL H. SCHWEIZER, W. STUART SCHWEIZER, LESLIE E. SCHWEIZER, KAWADA INDUSTRIES, INCORPORATED,

> *Plaintiffs-Appellants*,

v.                                                                                     No. 14-4410

SIKORSKY AIRCRAFT CORPORATION,

> *Defendant-Appellee*,

---

For Plaintiffs-Appellants:              JOSEPH B. SCHMIT (Edward S. Bloomberg, Buffalo, NY, *on the brief*), Phillips Lytle LLP, New York, NY.

For Defendant-Appellee:                    STEVEN M. GREENSPAN (James Sicilian and
                                           John W. Cerreta, Day Pitney LLP, Hartford,
                                           CT, *on the brief*), United Technologies
                                           Corp., Hartford, CT.


        Appeal from a judgment of the United States District Court for the Western District of New York (Telesca, *S.J.*).

        **UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

        Plaintiffs-Appellants Paul H. Schweizer, W. Stuart Schweizer, Leslie ("Les") E. Schweizer, and Kawada Industries, Incorporated (the "Shareholders") are former shareholders of Schweizer Aircraft Corporation ("Schweizer"), which Defendant-Appellee Sikorsky Aircraft Corporation ("Sikorsky") purchased in 2004 pursuant to a Stock Purchase Agreement. The Shareholders brought suit against Sikorsky, claiming explicit breaches of the Stock Purchase Agreement and breach of the Agreement's implied covenant of good faith and fair dealing. The District Court for the Western District of New York (Telesca, *S.J.*) granted summary judgment in favor of Sikorsky and denied the Shareholders' amended partial cross-motion for summary judgment, thereby dismissing all of the Shareholders' claims against Sikorsky. The Shareholders appeal that dismissal, but only with respect to three of their six original claims. We assume the parties' familiarity with the  underlying facts, procedural history, and issues on appeal.

        "We review a district court's decision to grant summary judgment *de novo*, construing the evidence in the light most favorable to the party against which summary judgment was granted and drawing all reasonable inferences in its favor." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 815 (2d Cir. 2014) (quoting *Wachovia Bank, N.A. v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011)). Similarly, we "review *de novo* 'questions as to the plain meaning or ambiguity of the language of a contract.'" *Id.* (quoting

*Fabozzi v. Lexington Ins. Co.*, 601 F.3d 88, 90 (2d Cir. 2010)). And "[w]e will affirm a grant of summary judgment only if there is no genuine issue of material fact and the prevailing party was entitled to judgment as a matter of law." *Id.* As provided in Section 8.7 of the Stock Purchase Agreement, New York law governs our interpretation of the Agreement.

## I. The Shareholders' First Claim

First, the Shareholders argue that Sikorsky breached a provision of the Stock Purchase Agreement that they contend required Sikorsky to provide written notice to their agent within 60 days of settling two product liability lawsuits. There is no dispute that Sikorsky failed to provide notice in this precise form. The district court held that the disputed provision did not require written notice of the settlements largely because the two lawsuits were known to the Shareholders at the time the Stock Purchase Agreement was signed, but we need not resolve this dispute over the contract's interpretation. Instead, we agree with the district court's alternative holding that the Shareholders' claim fails even if the Stock Purchase Agreement required Sikorsky to provide written notice of the two settlements and their related costs.

Under New York law, "strict compliance with contractual notice provisions need not be enforced where the adversary party does not claim the absence of actual notice or prejudice by the deviation." *Fortune Limousine Serv., Inc. v. Nextel Commc'ns*, 826 N.Y.S.2d 392, 395 (App. Div. 2006) (collecting cases). The Shareholders do not claim prejudice here, nor could they: It is undisputed that Sikorsky had sole discretion under the Agreement to settle the two lawsuits and that the total amount of the damages and costs for the two lawsuits exceeded the amount owed to the Shareholders. The Shareholders were also kept abreast of the lawsuits' progression after the deal closed, and they had actual notice of Sikorsky's intent to settle both lawsuits for an amount that would exceed their "Contingent Payment Amount." Even if notice were required, then, we may excuse Sikorsky's failure to provide written notice to the Shareholders' agent within 60

3

days of settling the lawsuits because the Shareholders had actual notice and were not prejudiced by the lack of written notice to their agent.

Moreover, even if the notice requirement were, as the Shareholders contend, a condition precedent—and it is not at all clear that it is—this does not mean that the notice requirement must be enforced regardless of its import or its consequences. Rather, "to the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995) (quoting Restatement (Second) of Contracts § 229 (Am. Law. Inst. 1981)). There is no dispute that the Shareholders are not entitled to the Contingent Payment Amount if the total sum of the product liability settlements and related costs exceeded the earned contingent payment plus the liability reserve. Enforcing the disputed notice provision according to the Shareholders' interpretation would therefore result in a $5.5 million windfall in their favor. The Shareholders likewise fail to demonstrate that providing written notice to their agent was a material part of the parties' agreed exchange. Thus, even if the notice requirement were a condition precedent, we may excuse its non-occurrence on the facts here. *Cf.* Restatement (Second) of Contracts § 229 illus. 2.

## II.     The Shareholders' Fourth Claim

Second, the Shareholders argue that Sikorsky breached the implied covenant of good faith and fair dealing based on its management of the RU-38B program. Under New York law, "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995). The New York Court of Appeals has described this covenant broadly as "embrac[ing] a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other

4

party to receive the fruits of the contract.'" *Id.* (quoting *Kirke La Shelle v. Paul Armstrong Co.*, 188 N.E. 163, 167 (N.Y. 1933)). But the Court of Appeals has also stated that "[w]here the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Id.* at 291. The Court of Appeals further clarified that it "will not interfere with [a] discretionary determination unless it is performed arbitrarily or irrationally." *Id.* at 293.

In a recent case applying New York law and involving an "earnout" provision like the contingent payments here, we similarly explained that "[t]he implied covenant does not 'undermine a party's general right to act on its own interests in a way that may incidentally lessen' the other party's expected benefit." *Sec. Plans, Inc.*, 769 F.3d at 817 (quoting *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)). Stated differently, "[w]hile New York courts generally will not disturb actions taken pursuant to a party's business judgment, the New York Court of Appeals has explained . . . that arbitrary decision-making is incompatible with the exercise of legitimate business judgment." *Id.* at 819 (citations omitted). If the defendant "had a genuine and colorable business justification for its decision, then its actions will not have been arbitrary, and thus will not have violated the implied covenant." *Id.* at 820.

Far from being arbitrary and capricious, the undisputed facts demonstrate that Sikorsky's staffing decisions were driven by a genuine and colorable business justification. Schweizer's post-closing General Manager, Randy Simpson, described Les Schweizer, who remained an executive of Schweizer after closing, as the "engineering brains behind the company." J.A. 2683–84. Simpson also stated that "[i]mmediately post closing [Les Schweizer] was very focused on the current product that was in development," namely the "two in development, the RU-38 surveillance aircraft, and the Fire Scout, which was [an] unmanned vehicle that

[Schweizer was] producing as a subcontractor for Northrop Grumman." J.A. 2684. Over time, Simpson directed Les Schweizer to spend more of his time on the X2 program. Simpson further testified that, "[a]s X2 came on line" in early 2005, "more and more of [Les Schweizer's] time was spent on X2." J.A. 2685. When Les Schweizer was asked why Simpson tasked him with the X2 program, Les Schweizer testified that "Randy [Simpson] felt that the X2 was the most important thing that the company was focused on and [Simpson] wanted that thing to be a success." J.A. 1229. He also stated that "Sikorsky management felt that the X2 was an important program for their future in the helicopter business." J.A. 1233. With Les Schweizer occupied by the X2 program, another Schweizer employee, Jim Daum, began taking over day-to-day responsibility for the RU-38B program. Les Schweizer acknowledged that, "at the time Jim [Daum] was selected . . . [,] he was basically the best choice" Schweizer had, other than himself, to manage the program. J.A. 1230. He also testified that "[w]e had so much stuff going on that, yeah, physically I just couldn't spend enough time on the [RU-38B] program." J.A. 1232. But Les Schweizer also acknowledged that he never refused to assist Daum because he was too busy and that Simpson never instructed him not to assist Daum. Accordingly, because Sikorsky "had a genuine and colorable business justification for its decision, . . . its actions [were not] arbitrary, and thus [it did not] violate[] the implied covenant." *Sec. Plans, Inc.*, 769 F.3d at 820.

### III.    The Shareholders' Sixth Claim

Finally, the Shareholders contend that Sikorsky improperly calculated the total costs of the RU-38B program. This claim for breach of contract actually embodies three separate arguments relating to the calculation of the Stock Purchase Agreement's "Deferred Payment Amount": (1) that Sikorsky "double dipped" from the "Purchase Price Adjustment" and the Deferred Payment Amount; (2) that Sikorsky acknowledged the RU-38B program's expenses were overstated by up to $500,000 but never attempted to determine the precise amount of the

6

overstatement; and (3) that Sikorsky improperly included "estimated" costs in its final calculation of the RU-38B program's expenses. We conclude that the Shareholders' arguments lack merit for substantially the same reasons provided by the district court. *See Schweizer v. Sikorsky Aircraft Corp.*, No. 6:10-CV-6547(MAT), 2014 U.S. Dist. LEXIS 151951, at *35–44, 2014 WL 5460504, at *13–15 (W.D.N.Y. Oct. 27, 2014). Moreover, to the extent the Shareholders now complain that the RU-38B program's expenses may have been overstated by as much as $500,000, the undisputed record evidence indicates that they themselves are to blame for these cost overstatements.

The Shareholders' cost-overstatement argument centers on an email from Schweizer's Chief Financial Officer, Sharon Reed, in September 2007. When a Sikorsky representative asked Reed for an accounting of the program's costs, Reed provided the figures to him but also remarked: "Please note that these numbers include direct material charges that we believe are over stated. We are in the process of auditing the direct material dollars charged to the program, but this cannot be accomplished prior to October 1. The magnitude of this overage could be in the range of $50,000 to $500,000." J.A. 2494. The Shareholders latch on to this email to argue that Sikorsky *may have* overstated the RU-38B program's costs.

At her deposition, Reed explained why the costs could be overstated: When Schweizer received an invoice for parts, it would allocate that invoice to the programs for which the parts were intended, but its method of allocating the exact costs of the invoice to each program was imprecise. For example, if an invoice included parts intended for both the RU-38B and X2 programs, the invoice amount would be divided equally with 50% of the cost allocated to RU-38B and 50% to X2, even if 80% of the invoice's costs were actually destined for one program or the other. Reed agreed that Schweizer "didn't have a system to be any more careful than that."

7

J.A. 2055. A Sikorsky representative also provided uncontroverted testimony that, "[f]ollowing the sale of Schweizer Aircraft to Sikorsky, accounting for the costs of the RU-38B Program continued to be handled by Schweizer Aircraft finance personnel, according to the same accounting policy, utilizing the same system, overseen by the same individuals, as before the sale." J.A. 336.

In short, Sikorsky inherited a method of accounting from the Shareholders, and it is this method of accounting that may have caused an overstatement of the RU-38B program's costs. Moreover, the Shareholders point to no provision of the contract or record evidence that would suggest that the parties intended to use a different method to calculate the RU-38B program's costs after closing from the one that Schweizer used prior to closing. Where a breaching party has made difficult the precise calculation of damages, courts typically impose the burden of uncertainty on the wrongdoer. *See, e.g.*, *Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447, 455 (2d Cir. 1977) ("We hold that the method of proof used by the plaintiffs was adequate in the circumstances. Since Seagram's breach has made difficult a more precise proof of damages, it must bear the risk of uncertainty created by its conduct."). We similarly see no reason why the Shareholders should not bear the risk that the accounting system they devised may have led to an overstatement of the RU-38B program's costs, particularly where the contract does not indicate a new method of accounting would be used after closing.

For the reasons stated herein the judgment of the district court is **AFFIRMED**.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

8