PEPSICO, INC., Plaintiff,

v.

CENTRAL INVESTMENT
CORPORATION, INC.,
et al., Defendants.

No. C–1–98–389.

United States District Court,
S.D. Ohio,
Western Division.

May 11, 2001.

Stephen Jospeh Butler, Renee S. Filiatraut, Thompson Hine LLP, Cincinnati, OH, Roger Pascal, John C. Martin, Thomas Paul Luning, James A. Clark, Caroline K. Sheerin, Kevin S. Hovis, Annaliese F. Fleming, Anne Hall Burkett, Robin M. Spencer, Thomas B. Quinn, Schiff Hardin & Waite, Chicago, IL, Gerard W. Casey, PepsiCo Inc. Law Dept., Purchase, NY, Robert A. McMahon, Eberly McMahon Hochscheid LLC, Cincinnati, OH, for PepsiCo, Inc.

G. Jack Donson, Jr., Taft Stettinius & Hollister, Cincinnati, OH, James Burdette Helmer, Jr., Helmer Martins & Morgan, Cincinnati, OH, Helen G. Kirsch, Judith L. Harris, William A. Georghegan, Reed Smith Shaw & McClay, Washington, DC, for Central Investment Corp.

James Burdette Helmer, Jr., Helmer Martins & Morgan, Cincinnati, OH, for Pepsi-Cola Bottling Co. of Ft. Lauderdale-Palm Beach, Inc.

### ORDER

BECKWITH, District Judge.

This matter comes before the Court on PepsiCo's motion for summary judgment (Doc. No. 201). For the reasons set forth below, PepsiCo's motion for summary judgment is **GRANTED IN PART, DENIED IN PART, AND MOOT IN PART.**

### I. *Factual and Procedural Background*

In its order of April 26, 2001 (Doc. No. 245), which ruled on motions for summary judgment filed by Central Investment Corporation and Pepsi–Cola Bottling Company of Ft. Lauderdale–Palm Beach (collectively "CIC"), the Court set forth in detail the parties' history and the factual background behind the dispute between them. The Court, therefore, will not repeat that description here. In short, however, the dispute concerns the Bottling and Syrup Appointments the parties have entered into and their respective rights thereunder. The earlier order dealt primarily with PepsiCo's allegations that CIC had breached its duties under the Syrup Appointment to push vigorously and secure full distribution of Pepsi syrup within its territories. The order also addressed CIC's motion for summary judgment on its prayer for a declaration of rights under the Syrup Appointment. In pertinent part, the Court ruled that under the terms of the Syrup Appointment, absent consent from CIC, open commissary delivery is not a permissible means of providing syrup to National Account Customers.

This order addresses PepsiCo's motion for summary judgment on the claims asserted against it by CIC in CIC's counterclaim (Doc. No. 50). CIC generally claims that PepsiCo has taken certain actions which not only breached its duties to CIC under the terms of the Bottling and Syrup Appointments, but that these actions were calculated efforts to eliminate the profit from CIC's syrup business and drive down the value of the company. Count I of the Counterclaim asserts claims for breach of the Syrup Appointment and breach of the duty of good faith and fair dealing under

the terms of the Syrup Appointment. Count II asserts a claim for breach of the Bottling Appointments. Count III asserts a claim for breach of contract based on alleged violations of a 1988 settlement agreement entered into by CIC and Pepsi-Co. Count IV asserted two claims for declaratory judgment. The first claim, which involved whether PepsiCo could provide open commissary delivery in CIC's territories, the Court resolved in its earlier order (Doc. No. 245). The second claim requested a determination of CIC's rights upon making a decision to sell the franchise. CIC now agrees, however, that since there are no plans to sell the business, that claim for relief is now moot, and, therefore, has withdrawn it. Most, if not all, of the facts surrounding CIC's claims appear to undisputed.

As explained in the earlier order, in 1985, CIC and PepsiCo signed an amendment ("the 1985 Amendment") to the original Syrup Appointment which delineated the parties' rights with respect to the provision of closed commissary delivery to National Account Customers. Paragraph 10(f) of the 1985 Amendment provides that PepsiCo will pay to CIC a per gallon fee, called the Store-door Delivery Fee to serve as a manufacturing and delivery agent of syrup to National Account Customers. *See* Doc. No. 201, Ex. C. This section gives to PepsiCo complete control over setting the Store-door Delivery fee. The section further provides that:

> The Company recognizes that the Store-door Delivery fee should provide to the Bottler an adequate margin after ingredient costs. Accordingly, the Company will establish programs from time to time that will protect the Bottler from an exceptionally low margin after ingredient costs caused either by an unusually rapid and sustained escalation in the cost of ingredients used in manufacturing the Beverage Syrup or by an unusual and sustained decrease in the Nation-

al Account price caused by competitive pressure and which escalation or decrease affects a substantial majority of all other licensed bottlers of the Beverage syrup as well as the Bottler.

*See id.* PepsiCo not only sets the fee it has to pay to bottlers for store-door delivery, it also controls the price the bottler must pay to obtain the ingredients to manufacture the syrup. PepsiCo, however, has not increased the Store-door Delivery Fee since 1997, the time at which PepsiCo began its initiative to persuade bottlers to allow for the provision of open commissary delivery to National Account Customers. While PepsiCo has not increased the Store-door Delivery Fee in that time, it has increased the cost of ingredients by 21%. The record reflects that every year prior to 1997, there was a corresponding increase in the Store-door Delivery Fee for each increase in ingredients costs. CIC claims that PepsiCo's failure or refusal to increase the Store-door Delivery Fee is a coercive price squeeze calculated to compel it to permit open commissary delivery. CIC also claims that PepsiCo's failure to increase the Store-door Delivery Fee in the face of increased ingredients costs is a violation of the "adequate margin" clause. Pepsico claims that despite the apparent freeze on the Store-door Delivery Fee, CIC has failed to demonstrate that its margins on store-door delivery are inadequate. Furthermore, Pepsico argues, CIC has not demonstrated an "unusually rapid and sustained escalation in the cost of ingredients" or that such escalation affects a substantial majority of all other bottlers. Therefore, PepsiCo contends, the adequate margin clause is not triggered.

Paragraph 10(c) of the 1985 Amendment provides that: "The Company agrees to service National Account Customers through Bottler store-door delivery except for those National Account Customers

which operate a self distribution system (hereinafter called a Commissary) [.]" *See id.* While the parties agree that the Syrup Appointment reserves to PepsiCo the right to sell syrup to National Account Customers on terms of PepsiCo's choosing, CIC claims that PepsiCo's efforts to offer open commissary delivery to National Account Customers within CIC's territories is a violation of the Amendment.

In order to protect the territorial exclusivity of its independent bottlers' territories, PepsiCo has always had in effect a transshipment policy. A "transshipment" occurs when one bottler ships Pepsi products into the territory of another bottler. In order to prevent this practice, PepsiCo set up a system wherein alleged transshipments could be reported. PepsiCo would then investigate the incident, and, if a transshipment had taken place, levy a fine against the guilty bottler. CIC claims that PepsiCo has violated the transshipment policy by refusing or failing to take action against commissaries who have made deliveries into CIC's exclusive territories and by not paying transshipment fees to CIC when PepsiCo causes open commissary deliveries to National Account Customers.

In 1988, the parties entered into a settlement agreement which further refined payment of the Store-door Delivery Fee. In pertinent part, the settlement agreement provides:

> For purposes hereof, "Store-door Delivery Fee" shall be defined as it is defined in paragraph 10(f) of the Amendments to Syrup Appointments of January 22, 1985 between the parties ... that is to say the prevailing Store-door Delivery Fee in effect for Pepsi–Cola bottlers at the time, plus when margin protection is in effect, the per gallon amount of any margin protection payments owed by Pepsi–Cola under paragraph 10(f).

*See* Doc. No. 201, Ex. D, at 2. As the Court noted above, PepsiCo has not increased the Store-door Delivery Fee it pays to bottlers who have not allowed PepsiCo to provide open commissary delivery in their territories since 1997. By contrast, for bottlers who have permitted PepsiCo to provide open commissary service, PepsiCo has increased what it calls the Bottler Delivery Remittance ("BDR") every year. CIC contends that while the Store-door Delivery Fee and the BDR bear different names, they are actually the same thing— the fee that PepsiCo pays to the bottler for producing and delivering syrup. Because the vast majority—approximately 95%—of the independent bottlers have waived the right to prevent open commissary delivery, CIC contends that the BDR *is* the prevailing fee in effect for all bottlers and that PepsiCo has, therefore, breached the settlement agreement by not paying CIC the equivalent of the BDR. PepsiCo claims that the BDR is not the prevailing Store-door Delivery fee, but rather is simply an additional benefit paid to signers of the 1997 waiver.

PepsiCo has entered into certain agreements with several "Anchor Bottlers"— very large, independent bottling operations. According to the master agreement with these Anchor Bottlers, upon acquisition of another bottler's territories, the Anchor Bottler agrees to eliminate store-door delivery to National Account Customers. CIC claims that by entering into these agreements, PepsiCo has unilaterally taken a transferable right (the right to provide store-door delivery to National Account Customers) and transformed it into a non-transferable right, thereby reducing the value of the Syrup Appointment to CIC. PepsiCo contends that CIC has suffered no harm from these master agreements because nothing in them compels CIC to sell its franchise to an Anchor Bottler.

The parties agree that over the years CIC and PepsiCo have entered into hundreds of appointments covering the various and sundry soft drinks that PepsiCo offers for sale. Among these products, CIC held appointments to distribute Slice lemon-lime drink and Ocean Spray fruit drinks. In the fall of 2000, PepsiCo phased out Slice and Ocean Spray and introduced Sierra Mist, also a lemon-lime drink, and Dole fruit drinks. CIC does not contest PepsiCo's decision to unilaterally eliminate Slice and Ocean Spray from its product line. PepsiCo, however, did not offer CIC appointments to sell and distribute Sierra Mist and Dole. PepsiCo admits that the only reason it did not offer CIC Sierra Mist and Dole appointments is because it was seeking to terminate CIC as a franchisee altogether. CIC contends, and PepsiCo apparently agrees, that never before has PepsiCo refused to tender appointments for new products to CIC. CIC contends that the parties' course of dealing has created an implied-in-fact contract which requires PepsiCo to offer CIC appointments for Sierra Mist and Dole fruit drinks.

CIC argues that PepsiCo misconstrues these incidents as separate breaches of the Syrup Appointments. Rather, CIC contends, these incidents all support "[t]he primary thrust and unifying theme of the counterclaim ...that PepsiCo has taken a number of actions against CIC to drive the profit out of CIC's fountain-syrup business." *See* Doc. No. 218, at 1.

## II. *The Summary Judgment Standard of Review*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving party, who is given the benefit of all favorable inferences that can be drawn therefrom. *United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

The Court will not grant summary judgment unless it is clear that a trial is unnecessary. The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id.*

The fact that the weight of the evidence favors the moving party does not authorize a court to grant summary judgment. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 472, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). "[T]he issue of material fact required by Rule 56© ... to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial." *First National Bank v. Cities Service Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

Moreover, although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir.), *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). According to the Supreme Court, the standard for granting summary judgment mirrors the standard for a directed verdict, and thus summary judgment is appropriate if the moving party establishes that there is insufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id.* at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

Accordingly, summary judgment is clearly proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548. Significantly, the Supreme Court also instructs that the "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion" against a party who fails to make that showing with significantly probative evidence. *Id.; Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. Rule 56(e) requires the non-moving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Id.*

Further, there is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or similar materials negating the opponent's claim. *Id.* Rule 56(a) and (b) provide that parties may move for summary judgment "with or without supporting affidavits." Accordingly, where the non-moving party will bear the burden of proof at trial on a dispositive issue, summary judgment may be appropriate based solely on the pleadings, depositions, answers to interrogatories, and admissions on file.

### III. *Analysis*

■ The Court begins the analysis somewhat out of order by starting with CIC's claims that PepsiCo has breached its duties of good faith and fair dealing under the terms of the Syrup Appointments. This claim seems to be CIC's most comprehensive allegation and the one most attuned to the "primary thrust and unifying theme" of the Counterclaim.

■ As the Court stated in the earlier order, under New York law, every contract carries with it an implied duty of good faith and fair dealing. *Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 230 (2d Cir.1991). This means that one party to the contract will not intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement. *Id.* The covenant of good faith and fair dealing is also violated when a party acts in a manner which would deprive the other party of the right to receive the benefits of their agreement. *Don King Productions, Inc. v. Douglas*, 742 F.Supp. 741, 767 (S.D.N.Y. 1990). This covenant does not create new rights nor does it impose any obligation which would be inconsistent with the other terms of the contract. *Id.* The Court finds that there are genuine issues of material fact as to whether PepsiCo breached its duties of good faith and fair dealing and that, therefore, summary judgment in PepsiCo's favor on this claim is inappropriate.

The facts in *Carvel Corp. v. Baker,* 79 F.Supp.2d 53 (D.Conn.1997), are remarkably similar to the ones presented in this case, and, therefore, deserve discussion at length. *Baker* involved a franchisor/franchisee distribution agreement. Carvel Corporation was a maker of speciality ice cream and other frozen desserts. Carvel sold individual franchises so that its ice cream could be sold through separately standing stores. Each franchisee was allocated his own exclusive territory. Carvel sold a liquid dairy mix used to make the ice cream directly to the franchisee, who then manufactured the ice cream on his premises and sold directly to the consuming public. Traditionally, these franchisee-owned stores were the only outlet for Carvel ice cream. The ice cream was not available for purchase in supermarkets, convenience stores, or other restaurants. *See id.* at 55, 56. In pertinent part, the franchise agreement provided:

> *The parties acknowledge and agree that there has been created a unique system for the production, distribution and merchandizing of Carvel products* ... These high quality (Carvel) products are sold in fine sanitary stores created in accordance with exclusive designs and specifications also originated by the owner of the Carvel trademarks, and the public has been accustomed to seek and purchase Carvel products at these unique stores which are hereinafter referred to as "Carvel Stores." These Carvel stores operate under the name "Carvel" and under the Carvel trademarks which cover not only the products manufactured and sold at these unique stores, but also the type of retail store at which the products are sold.

*Id.* at 57–58 (emphasis in original). Carvel had assured its franchisees that Carvel had no plans to enter the supermarket business because of the negative impact it would have on the franchisees. *Id.*

In 1992, however, Carvel determined that the consumer trend was running towards purchasing ice cream through supermarkets. Therefore, Carvel developed a program wherein it began licensing dealers to sell ice cream in Carvel-brand freezers at certain approved locations. Although the dealers were permitted to sell within the franchisees' market areas, they were not authorized to sell within the franchisees' exclusive territories. In 1994, Carvel stepped up its efforts to expand the wholesale distribution of ice cream through supermarkets and convenience stores. It appears that Carvel funded an extensive promotion campaign for its supermarket initiative and in fact offered ice cream for sale in supermarkets at significantly lower prices for the same products in the franchisee stores. *Id.* at 56–57. The franchisees complained that they bought their franchises with the expectation that franchise stores would remain the exclusive method for distributing Carvel ice cream. *Id.* Carvel claimed that without expanding the distribution network in response to the consumer trend, Carvel-brand ice cream would not survive the decade. *Id.*

New York law governed the parties' franchise agreements. *Id.* at 54. The franchisees claimed that Carvel breached the implied covenant of good faith and fair dealing by supplying ice cream in their franchise areas at predatory prices, by favoring supermarket distribution over franchise store distribution, and by failing to provide proper support to the franchisees. Carvel moved for summary judgment on the franchisees' claim, arguing that it acted in good faith because the brand would have collapsed without supermarket distribution. The district court held that there were genuine issues of material fact which precluded summary judgment. *See id.* at 62. The court observed that the franchise agreement contemplated a "unique system" of distribu-

tion, under which it was reasonable to presume that supermarket distribution was precluded. The court also noted that for many years, Carvel had distributed ice cream only through franchise stores and considered supermarkets and other ice cream stores to be direct competitors. Furthermore, Carvel had assured franchisees that it had no intention of implementing supermarket distribution. Therefore, the court concluded, it was reasonable to assume that the parties contemplated that the benefit of the franchise agreement was a unique relationship with Carvel, to the exclusion of supermarkets and other sales venues. Thus, the Court concluded, it could be found that Carvel's supermarket program deprived the franchisees of the benefits of their agreements. *Id.* at 62.

The present case is identical to *Baker* in every important respect. The record reflects that for the better part of the 20th century, PepsiCo's business was founded on the notion that the best way to sell its product was through the granting of exclusive territories to independent, family-owned bottlers, like CIC. *See* Doc. No. 218, Ex, 156. Traditionally, customers have been served through store-door delivery. Through the years, PepsiCo has encouraged its independent bottlers to continue to invest in their bottling operations based on the exclusivity of their territories. *See id.* at 4 ("In return for [ ] narrow intra-brand competition, the bottler is encouraged to invest in favor of the brand he is licensed for."); Doc. No. 201, Ex. D, 1988 Settlement Agreement, at 2 ("[T]he parties desire to provide for the continued aggressive investment with respect to the sale of Pepsi–Cola syrup products in Bottlers' Territories."). PepsiCo executives have in the past extolled the virtues of exclusive territories and store-door delivery both publicly and privately. *See* Doc. No. 218, Ex. 155, Roger Enrico Memorandum ("I want to be certain that every individual in the PBG Sales and Marketing function is

totally committed to building our business solely upon the cornerstone of our store-door delivery system. This system is absolutely the best method to sell, deliver, and merchandise our products."); *Id.* Ex. 156, Testimony of PepsiCo V.P. to House Subcommittee on Monopolies and Commercial Law ("[Exclusive territories] have fostered store-door delivery—the most effective selling tool[.]"); *Id.* Ex. 157, Roger Enrico Letter to Pepsi–Cola Bottlers ("Pepsi–Cola Company is firmly committed to preserving the integrity of exclusive territories."); *Id.* Ex. 172, Letter from PepsiCo CEO John Sculley to Pepsi–Cola Bottling Company of Ft. Lauderdale–Palm Beach, Inc. ("[S]tore-door delivery and full development of each territory are the hallmark and backbone of our enterprise."). Although the Syrup Appointment reserves to PepsiCo the right to sell syrup to National Account Customers, the 1985 Amendment states that PepsiCo "agrees to service National Account Customers through Bottler store-door delivery except for those National Account Customers which operate a self-distribution system[.]" *See* Doc. No. 201, Ex. C, 1985 Amendment ¶ 10(c). This statement clearly does not contemplate open commissary delivery as a method of distribution. Like the franchisees in *Baker,* from the agreements between the parties and PepsiCo's apparently firm commitment to the traditional method of distribution, one could find that a primary benefit to CIC under the Syrup Appointment is the right to provide store-door delivery to all customers except those customers operating a closed commissary.

As in *Baker,* however, a juror could find that PepsiCo has taken actions which deprive CIC of the benefit of its agreement with PepsiCo. For instance, as evidenced by its presentations to Tricon, PepsiCo has aggressively marketed open commissary delivery to National Account Customers and has indicated that pricing and funding

are more favorable to the customer with this method. *See, e.g.,* Doc. No. 218, Ex. 177, at PEPS 00220683, 00220687, 0022068689; *id.* Ex. 178, at PEPS00220578; *id.* Ex. 179, at PEPS0022544. Like Carvel, when it established the supermarket distribution system, PepsiCo competes directly with independent bottlers like CIC when it pushes open commissary delivery, despite its promise to service its customers through store-door delivery (except where closed commissary delivery is applicable). While Carvel's establishment of a supermarket distribution was arguably justified by a prediction that its brand would not last on the market without the new system, no such predictions have been made for Pepsi, despite PepsiCo's claim that it needs open commissary delivery in order to compete with Coke. Indeed, the judge in the Pepsi/Coke antitrust case found that store-door delivery remains an acceptable alternative for customers. *See PepsiCo, Inc. v. The Coca–Cola Company,* 114 F.Supp.2d 243, 250 (S.D.N.Y.2000). While PepsiCo argues that CIC has suffered no damages from its open commissary initiative because it has not provided open commissary delivery within CIC territories, obviously, the more PepsiCo incentivizes National Account Customers to opt for open commissary delivery, the more CIC is pressured to abandon store-door delivery operations. Surely this kind of pressure erodes CIC's contractual benefits.

The Court notes further that PepsiCo has not increased the Store-door Delivery Fee it pays to non-signing bottlers like CIC since 1997, after having increased the fee every year prior to 1997. Conversely, PepsiCo has continued implementing annual increases in the BDR it pays to signers of the 1997 waiver. Although the Syrup Appointment and the 1985 Amendment give PepsiCo the sole discretion to set the fee it pays, it still must do so in good faith. *See Dalton v. Educational Testing Serv.,*

87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 292 (1995) (where contract contemplates the exercise of discretion, the covenant of good faith and fair dealing includes a promise not to act arbitrarily or irrationally). The fact that the freeze in the Store-door Delivery Fee occurred at the same time as PepsiCo's initiative to get bottlers to allow open commissary delivery within their territories raises questions of fact concerning PepsiCo's good faith.

There may or may not be other incidents which support a claim that PepsiCo breached its duties of good faith and fair dealing under the Syrup Appointment (e.g., PepsiCo's alleged failure to uniformly enforce the transshipment policy; PepsiCo's refusal to offer CIC appointments for Sierra Mist and Dole fruit drinks). The evidence just discussed, however, creates a sufficient issue of fact as to whether PepsiCo has taken actions which have deprived CIC of the benefits conferred on it under the parties' agreement. Therefore, summary judgment in PepsiCo's favor on CIC's claim that PepsiCo breached its duties of good faith and fair dealing under the Syrup Appointment would be inappropriate.

■ The Court now turns to CIC's contention that PepsiCo has violated the "adequate margin" clause of the Syrup Appointment, and the 1985 Amendment thereto, by freezing the Store-door Delivery Fee while increasing the cost of syrup ingredients. PepsiCo argues that the adequate margin clause is not triggered because CIC has provided no evidence that its margins are inadequate. In response, CIC relies on the simple business reasoning that if the price of ingredients goes up and the reimbursement remains the same, then obviously its margins have declined. PepsiCo further argues that the clause is not triggered because there has been no showing of an unusually rapid and sus-

tained escalation in the cost of ingredients which is experienced by a majority of other licensed bottlers. CIC calls an increase of 21% in the cost of ingredients—the largest increase ever—de facto an unusually rapid and sustained increase.

The Court observes that the term "adequate margin" is not defined anywhere in the 1985 Amendment, although we suppose that a logical definition of "adequate margin" would be a profit sufficient to make it worthwhile to CIC to provide the service. While the Court agrees with PepsiCo that CIC has not produced any figures which show its actual margin on store-door delivery, the meaning of "adequate margin" is sufficiently ambiguous to preclude summary judgment on the issue. *See Ruttenberg v. Davidge Data Sys. Corp.*, 215 A.D.2d 191, 626 N.Y.S.2d 174, 175 (N.Y.App.Div.1995) ("[W]hen the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment."). CIC persuasively argues that the meaning of "adequate margin" cannot be predicated solely on its own bottom line on store-door delivery because that means that in effect PepsiCo would be required to subsidize bottlers with inefficient operations.

Similarly, the amendment does not define when an "unusually rapid and sustained escalation in the cost of ingredients" occurs. The Court observes from the table submitted by CIC, *see* Doc. No. 218, Ex. 187, Shell Aff. ¶ 5, that from 1993 to 1997, the year the open commissary initiative began, there was an average annual increase in the cost of PepsiCo concentrate of 2.96%. From 1997 to 2000, the average annual increase in the cost of concentrate was 5.42%. In addition, from 1994 to 2000, the cost of concentrate increased at an increasing rate,[1] although it should be noted that the rate of increase declined substantially for 2001. Was there an unusually rapid and sustained increase in the cost of ingredients? The cost of ingredients certainly spiked from 1998 to 2000 and the increase was sustained from 1994 to 2000. Given the ambiguity in the language, the Court believes that this phenomena is sufficient to overcome PepsiCo's motion for summary judgment. Finally, the Court agrees that the increase in cost of ingredients was uniform among a majority of bottlers. It appears that PepsiCo charges all bottlers the same price for concentrate. *See, e.g.* Doc. No. 281, Ex. 190, Memorandum from PepsiCo North America CEO Gary M. Rodkin "To: All Pepsi–Cola Bottlers Re: 2001 Concentrate Pricing."

In summary, the Court finds that there are genuine issues of material fact as to whether PepsiCo violated the "adequate margin" clause of the 1985 Amendment.

■ Finally, CIC claims that PepsiCo breached the terms of the 1988 Settlement agreement, which require PepsiCo to pay CIC the prevailing Store-door Delivery Fee in effect for Pepsi–Cola bottlers at the time. *See* Doc. No. 218, Ex, 131. As the Court previously noted, PepsiCo has frozen the Store-door Delivery Fee it pays to non-signers of the 1997 waiver agreement,

---

1. In other words, the percentage increase for the current year was greater than the percentage increase for the previous year. The figures (using the Court's own math skills) are as follows:

| Year | Pct. Increase in Concentrate |
|---|---|
| 1993–1994 | 2.91% |
| 1994–1995 | 2.69% |
| 1995–1996 | 2.71% |
| 1996–1997 | 3.21% |
| 1997–1998 | 3.28% |
| 1998–1999 | 5.53% |
| 1999–2000 | 7.54% |
| 2000–2001 | 3.23% |

*See id.*

like CIC, since 1997, while at the same time it has increased the "Bottler Delivery Remittance" ("BDR") it pays to signers of the 1997 waiver agreement each year. CIC contends that the Store–Door Delivery fee and the BDR are the same thing. Therefore, CIC explains, it is entitled to the BDR payments because over 90% of the bottlers have signed the 1997 waiver, making the BDR the prevailing fee. This claim presents a close question. The Court recognizes that PepsiCo ought to be able to enter into agreements which compensate some bottlers at a rate higher than others for providing a service that PepsiCo wants to provide. CIC's construction would give it the benefits[2] of signing the waiver without the commitment of providing the service. On the other hand, as CIC correctly points out, PepsiCo's own internal documents use the terms "Store-door Delivery Fee" and "Bottler Delivery Remittance" interchangeably. Indeed, PepsiCo's schedule of payments, which distinguishes between signers and non-signers of the 1997 waiver agreement, calls the fee paid to non-signers the Bottler Delivery Remittance. *See, e.g.,* Doc. No. 218, Ex. 190, at P108201, P108203. Therefore, the Court finds there are genuine issues of material fact as to whether the Store-door Delivery Fee and the Bottler Delivery Remittance are the same thing and whether in fact the Bottler Delivery Remittance is the prevailing Store-door Delivery Fee. Consequently, summary judgment on this issue would be inappropriate.

■ The Court next observes that although the parties have submitted 160 pages of briefs relating to CIC's Counterclaim, and probably ten times that amount in exhibits and deposition excerpts, the parties seemed to have completely failed to address Count II of the Counterclaim,

which alleges that PepsiCo has acted in bad faith in executing its obligations under the terms of the Exclusive Bottling Appointments. CIC claims in this Count that PepsiCo has acted in a manner calculated to force CIC out of the bottling and can business. Although PepsiCo has referenced Count II in section headings of its pleadings, none of its arguments specifically address the impact of the evidence on that claim. Since PepsiCo bears the burden of demonstrating an absence of material fact on this claim in the first instance, and no one has addressed the issue, summary judgment in PepsiCo's favor on this claim would be inappropriate.

■ Finally, PepsiCo argues that there are a number of individual allegations in the Counterclaim on which it has moved for summary judgment that CIC failed to oppose in its brief. Therefore, PepsiCo contends, summary judgment in its favor is appropriate to the extent that CIC claims them as individual breaches of the Syrup Appointment. PepsiCo identifies these allegations as: 1) claims of coercion to enter the 1997 waiver agreement; 2) claims concerning transshipments into the territories of bottlers other than CIC; 3) claims concerning "cross-docking" tests; 4) claims concerning bottle and can sales under the Tricon agreements; 5) claims for additional Brand Development Fees; 6) claims concerning PepsiCo's alleged public disparagement of CIC; and 7) general claims concerning discrimination. *See* Doc. No. 24, at 29. CIC argues that they are not claims for relief but rather events upon which it may introduce evidence at trial. To the extent that CIC claims these events constitute individual breaches of the Syrup Appointments, the Court finds PepsiCo's motion for summary judgment to be well-taken, and therefore, **GRANTED.**

---

**2.** Recognizing, of course, that CIC contends that PepsiCo is not providing additional bene-

fits to signers, it is merely penalizing non-signers by freezing their compensation level.

CIC would be entitled, however, to introduce proof of these events in establishing an alleged course of bad faith conduct on the part of PepsiCo, subject perhaps to well-taken motions in limine concerning relevance, materiality or other evidentiary defects.

**IT IS SO ORDERED.**